UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

| | |
|---|---|
| COMMON CAUSE INDIANA,<br><br>  Plaintiff,<br><br>v.<br><br>CONNIE LAWSON, in her official capacity as Secretary of State of Indiana, J. BRADLEY KING, in his official capacity as Co-Director of the Indiana Election Division, and ANGELA M. NUSSMEYER, in her official capacity as Co-Director of the Indiana Election Division,<br><br>  Defendants. | Case No. 1:17-cv-3936 |

**EXPERT REPORT OF DR. MICHAEL P. MCDONALD IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

I, Michael P. McDonald, hereby declare as follows:

My name is Michael P. McDonald. I am Associate Professor of Political Science at the University of Florida. I received my undergraduate degree in Economics at the California Institute of Technology and my PhD in Political Science from the University of California, San Diego. I held a one-year post-doctoral position at Harvard University and have taught previously at Vanderbilt University; University of Illinois, Springfield; and George Mason University.

I am widely regarded as a leading expert on United States elections. I have published extensively on elections in peer-reviewed journals and I produce what many consider to be the most reliable turnout rates of the nation and the states. I have specifically published peer-reviewed articles on the reliability of voter registration files and matching algorithms as applied to voter registration files. In the course of my elections work, I have consulted for the United States Election Assistance Commission, the Department of Defense's Federal Voting Assistance Program, the media's National Exit Poll organization, the Associated Press, ABC News, and NBC News.

I have been an expert witness in eighteen election litigation cases in the areas of redistricting, ballot access, and ballot styles. I have been an expert witness for plaintiffs in five voter registration cases in Florida, Georgia, Kansas, Massachusetts, and Washington. Georgia and Washington settled following the filing of my expert report, without a trial, by abandoning practices that required prospective registrants' identifying information to match exactly with

1

state drivers license or Social Security Administration databases. Please see my curriculum vitae for more information.

I have been asked by Plaintiffs' lawyers to review Indiana's procedures to cancel voter registration records that Interstate Voter Registration Data Crosscheck indicates are matched to another state's voter registration record. I am compensated at a rate of $350 an hour for my work on this report.

## SUMMARY OF MY OPINION REGARDING INDIANA'S CROSSCHECK PARTICIPATION

Indiana is a member of the Interstate Voter Registration Data Crosscheck (hereafter "Crosscheck"), an interstate compact whereby participating "…States agree to share voter registration information for the purposes of cross checking and identifying duplicate registrations and instances of multiple votes by the same individuals."[1]

Summarizing the Interstate Voter Registration Data Crosscheck 2017 Participation Guide, member states are required in January of each year to upload their entire voter registration database to a secure FTP site in a prescribed data format. States are asked to provide data for active and inactive voters, and the last four digits of the social security numbers (hereafter, "SSN4").

Kansas Secretary of State's staff match the voter registration records across states and return to the states a list of records that match on "first names, last names, and dates of birth match."[2] Crosscheck provides additional information such as registration dates and quality of SSN4 matches (described below).

Starting on July 1, 2017, Indiana law (Indiana Code § 3-7-38.2-5) requires county voter registration officials to take the following steps with respect to the any registered Indiana voter for whom "the first name, last name, and date of birth of the Indiana voter is identical to the first name, last name, and date of birth of the voter registered in the other state":

> (1) identified in the report provided by the NVRA official under this subsection is the same individual who is a registered voter of the county; and
>
> (2) registered to vote in another state on a date following the date that voter registered in Indiana.
>
> (e) If the county voter registration office determines that the voter is described by subsection (d), the county voter registration office shall cancel the voter registration of that voter.

It is my opinion that a high probability exists of a false match of Indiana registrants who happened by chance to share the same first name, last name, and date of birth with a registrant in

---

[1] See: "Memorandum of Understanding for Interstate Voter Registration Data Comparison," May, 2014, p.1.
[2] See: "Memorandum of Understanding for Interstate Voter Registration Data Comparison," May, 2014, p.1.

another state. This is born out in verification procedures conducted by Indiana county voter registration officials who reject or fail to take action on 22.7% of all Crosscheck matches they are asked to approve, and reject 57.6% of the matches that are identified as having the highest 100% confidence factor that a match is valid.

Furthermore, there are clear indications that county voter registration officials are not performing the same quality of scrutiny to all matches provided by Crosscheck. Eleven counties accepted all Crosscheck matches provided to them. Conversely, one county approved less than 1% of the Crosscheck matches it reviewed, and another county never investigated any matches.

It is my opinion that Indiana's use of Crosscheck pursuant to the new July 1, 2017 law will result in Indiana registered voters having their voter registration cancelled for no fault of their own due to a false match with a registered voter in another state. Furthermore county voter registration officials' policies and procedures to verify Crosscheck matches are haphazard, such that registered voters in some counties have a greater chance of having their registration cancelled due to a false positive match than registrants in other counties.

## DATA ANALYZED

I examined the following data provided to me by plaintiffs' counsel in preparation of this report:

- A file entitled "IndianaCrossCheck_20160121102712.csv". I understand this to be a file of individual records Indiana shared with Crosscheck in January, 2016.
- A file entitled "IndianaCrossCheck_20170116123853.csv". I understand this to be a file of individual records Indiana shared with Crosscheck in January, 2017.
- A spreadsheet entitled "2017 Interstate Crosscheck Results.xlxs". I understand this spreadsheet to be each individuals' matches returned by Crosscheck to Indiana.
- A spreadsheet entitled ""2017 Interstate Crosscheck SSN4_Masks.xlxs". I understand this spreadsheet to provide Crosscheck's match codes.
- A spreadsheet "InterstateCrossCheck Pivot.xlxs". I understand this spreadsheet to provide statistics on the disposition of Crosscheck matches by county election administrators.

## FALSE POSTIVE MATCHES

There are two potential errors that arise when matching databases' identifying information, false negative and false positive matches. I discuss false positive matches, which are the greatest threat to individuals' voting rights, and then false negative matches.

A false positive match occurs when records in two different databases have the same identifying information. One might assume these records are associated with the same individual, but if these records identify two different people a false positive match occurs. In a co-authored peer-reviewed article "Seeing Double Voting: An Extension of the Birthday Problem",[3] I

---

[3] Michael P. McDonald and Justin Levitt. 2008. "Seeing Double Voting: An Extension of the Birthday Problem." *Election Law Journal* 7(2): 111-22

demonstrated that the false positive matches happen with surprisingly high frequency among the millions of records in voter registration databases due to a quirk in statistics known as the "birthday problem."

The birthday problem is a counter-intuitive statistical problem used to puzzle introductory statistics students. A professor asks a class of 40 students what the odds are that two of them share the same birthday. One might assume the way to compute this probability is to divide the number of students by the number of days in a non-leap year, which yields 40/365 or 11%. This is incorrect. The proper way to compute the probability is to compare each student's birthday to the other 39 students' birthdays, in turn. When this probability is calculated, the odds of two students sharing the same birthday is a surprisingly high 90%.

The introductory statistics class form of the birthday problem involves only birthdays, without considering any other identifying information, such as first names, last names, and birth years. In the referenced article, we extend the problem to voter registration files. In the 2018 Indiana voter registration extract provided to me, there are 4,411,435 records. The most common name is Michael Smith, which occurs 698 times. Due to the quirk of the birthday problem, the probability is near 100% that two of these individuals share the exact same birthdate, including birth year despite being distinct individuals.

Indeed, there are three Michael Smiths with distinct voter registration numbers who share the same birthday of August 7, 1970. The three Michael Smiths are further instructive of the value of middle initial, as one of the three has a complete middle name of "Joseph" and one only has a middle initial of "J". Indiana records no middle name for 442,250 registrants and records only a middle initial for 2,220,505 registrants.

I cannot know how many Michael Smiths are on other Crosscheck states voter registration files since voter registration data from other Crosscheck states was not provided to me. Since there are tens of millions of more comparison states' voter registration records to match Indiana's Michael Smiths – and other names – against, the odds are near certainty that there a number of false positive matches on based on first name, last name, and exact birthdate.

## DISPOSITION OF CROSSCHECK MATCHES

This statistical probability of the birthday problem is borne out by data provided by the Indiana Secretary of State's office regarding the actions local election officials took with respect to the list registrants within their county when Crosscheck indicated a match existed in a comparison state.

The spreadsheet "InterstateCrossCheck Pivot.xlxs" (Hereafter "Crosscheck Pivot Table") provides statistics regarding the disposition of Crosscheck matches forwarded to county voter registration officials, for the years 2015, 2016, and 2017. These Crosscheck Pivot Table statistics are provided further for each county and for active and inactive registered voters.

County voter registration officials may take one four actions on each Crosscheck match forwarded to them through the State Voter Registration System (SVRS):[4]

- Match Approved: The county confirms there is a matched record.
- Match Rejected: The county confirms the voter record is not a match.
- Pending: The county has taken no action on the voter record.
- Research Needed: The county needs more research to confirm if there's a match.

In Table 1, I report yearly summary statistics of the disposition of Crosscheck matches as investigated by county voter registration officials.

Note that in 2017, Crosscheck forwarded 10,001 matches to Indiana (from "2017 Interstate Crosscheck Results.xlxs"), but Indiana forwarded 8,917 Crosscheck matches to county voter registration officials to investigate. The decrease of 1,084 records likely reflects voter registration records that were cancelled between when Indiana extracted and sent information to Crosscheck and when Indiana loaded the matches returned by Crosscheck into their voter registration system.

| Year | Match Approved | Match Rejected | Pending | Research Needed | Total |
|---|---|---|---|---|---|
| **2015** | 39,041 | 5,486 | 3,256 | 133 | 47,916 |
|  | (81.5%) | (11.4%) | (6.8%) | (0.3%) | (100.0%) |
| **2016** | 6,873 | 527 | 1,779 | 51 | 9,230 |
|  | (74.5%) | (5.7%) | (19.3%) | (0.6%) | (100.0%) |
| **2017** | 5,183 | 590 | 3,138 | 6 | 8,917 |
|  | (58.1%) | (6.6%) | (35.2%) | (0.1%) | (100.0%) |
| **2015-2017** | 51,097 | 6,603 | 8,173 | 190 | 66,063 |
|  | (77.3%) | (10.0%) | (12.4%) | (0.3%) | (100.0%) |

**Table 1. Disposition of Crosscheck Matches by Year, 2015-2017**

In the entire three year span from 2015 to 2017, county voter registration officials approved 77.3% of the Crosscheck matches they were asked to review. The overall approval rate decreased from 81.5% in 2015, to 74.5% in 2016, to 58.1% in 2017.

In the entire three year span from 2015 to 2017, county voter registration officials rejected 10.0% of the Crosscheck matches they were asked to review. The overall rejection rate varied from 11.4% in 2015, to 5.7% in 2016, to 6.6% in 2017.

In the entire three year span from 2015 to 2017, county voter registration officials kept in a pending state 12.4% of the Crosscheck matches they were asked to review. The overall pending rate varied from 6.8% in 2015, to 19.3% in 2016, to 35.2% in 2017.

---

[4] Definitions for Match Approved, Match Rejected, and Research Needed are verbatim as found in "Interstate Crosscheck Program Report - Baker Tilly (August 11 2015).docx". I infer the definition for pending through my experience with election administration.

In the entire three year span from 2015 to 2017, county voter registration officials identified as needing more research 0.3% of the Crosscheck matches they were asked to review. The overall research needed rate varied from 0.3% in 2015, to 0.6% in 2016, to 0.1% in 207.

I infer from the overall approval rate that county voter registration officials declined to take action on nearly a quarter (22.7%) of all Crosscheck matches presented to them during this three year time period. Furthermore, during these three years the match approval rate declined by 23.4 percentage points, primarily due to an increase of 28.4 percentage points in the percentage of Crosscheck matches pending review.

In my opinion, after an initial burst of activity by county voter registration officials to approve Crosscheck matches in the first year of the program, these officials more often expended less effort to review Crosscheck matches in subsequent years.

In July 1, 2017, Indiana instituted a policy of canceling individuals' voter registration applications if county voter registration officials approve a Crosscheck match. Prior to Jul 1, 2017, upon approval of a Crosscheck match, county voter registration officials generated a Crosscheck mailer.[5] Registered voters who received these mailers could take one four actions:

1. If the registrant ignores the mailer and
    a. votes in a listed upcoming election, their voter registration status will not change.
    b. does not vote in a listed upcoming election, their voter registration will be cancelled.
2. If the registrant responds to the mailer that they currently reside at their address, their registration status does not change.
3. If the registrant identifies that they have moved from the state, their voter registration is cancelled.
4. If the registrant identifies that they have moved to a new address in Indiana, their voter registration address is updated and their registration status does not otherwise change.

The Crosscheck Pivot Table does not provide information regarding the final disposition of individuals' registration status as a consequence of receiving a notification letter following an approved Crosscheck match. I am not aware that this information can be found in any data or documents provided to me. A plausible explanation for the decreasing Crosscheck match approval rate and increasing pending rate from 2015 to 2017 is that county voter registration officials did not find through the responses received by these mailings that they were reliably identifying individuals who had moved from Indiana, and therefore exerted lower effort to investigate Crosscheck matches.

## UNEVEN ELECTION ADMINISTRATION

There is clear evidence in the Crosscheck Pivot table that county election officials are not uniformly administering their responsibilities to investigate Crosscheck matches.

---

[5] An example notification letter is found in "Multi-State Voter List Maintenance Step-by-Step.pdf", p. 7.

County voter registration officials in eleven counties – Brown, Carroll, Decatur, Fulton, Marshall, Martin, Pike, Vermillion, Warren, Washington, and Wells – approved every Crosscheck match presented to them for review. County voter registration officials in thirteen counties – Boone, Clinton, Dearborn, DuBois, Gibson, Green, Hendricks, Jasper, Johnson, Fountain, Scott, Spencer, and Steuben – approved 99% or more of their Crosscheck matches.

Conversely, Elkhart approved 0.2%. Three counties – Franklin, Parke, and Porter – approved less than 50% of their Crosscheck matches. Delaware county voter registration officials never reviewed any Crosscheck matches, with all of their matches having a pending status.

In my opinion, there is clear evidence county voter registration officials are applying inconsistent policies and procedures as to how they review Crosscheck matches. It appears that some county voter registration officials accept all Crosscheck matches in bulk with little or no review. This is particularly troubling in light of the July 1, 2017 law that instructs county voter registration officials to cancel all approved Crosscheck matches without notice. Conversely, other county voter registration officials give little or no attention to the Crosscheck matches they are asked to review.

The variation in county voter registration officials' review of Crosscheck matches is disturbing since it means that depending on where a registrant lives, they may be more or less likely to be summarily removed from the voter registration rolls due to a false positive Crosscheck match.

## SSN4 MATCHES

Crosscheck also provides information on the consistency of SSN4 among these matched records. A problem with SSN4 is that it is often missing in either Indiana's or another participating state's (what Crosscheck calls a "comparison state") voter registration records. To address this problem, Kansas first matches records on first names, last names, and dates of birth and then reports to Indiana the quality of a SSN4 match in the base and comparison state for each record.

The codes describing the quality of the matches is provided in the spreadsheet "2017 Interstate Crosscheck SSN4_Masks.xlxs". By cross-referencing this spreadsheet and "2017 Interstate Crosscheck Results.xlxs", I determined the following 2017 statistics regarding the quality of match of Indiana's voter registration records and comparison states' records:

- 1,389 matches (13.9%) where Indiana and the comparison state <u>did not</u> provide SSN4.
- 1,226 matches (12.3%) where Indiana <u>did</u> provide SSN4, but Indiana's SSN4 does not match the comparison state's SSN4.
- 5,262 (52.6%) matches where Indiana <u>did not</u> provide SSN4 and the comparison state did provide SSN4.
- 14 matches (0.1%) that Crosscheck deemed invalid.
- 2,110 matches (21.1%) where Indiana and the comparison state <u>did</u> provide SSN4, which matched exactly.

An important implication of these 2017 statistics is only 21.1% of the name and date of birth matches Crosscheck reported to Indiana includes a SSN4 match. For 78.9% of the matches either

7

Indiana or a comparison state did not have SSN4 for the matched records or the match was deemed invalid.

That so few of the Crosscheck matches include SSN4 is not surprising in the light of the fact that less than half of the voter registration records Indiana shared with Crosscheck have SSN4. In 2016, 44.6% – or 2,066,009 of the 4,634,099 – records had SSN4.[6] In 2017, 46.0% – or 481,520 of the 1,047,252 – records had SSN4.[7]

If Crosscheck comparison states are missing SSN4 in their voter registration data similar to Indiana's rates, then SSN4 simply is not present in both Indiana and a comparison state for matching purposes for a significant number of the supposed matches. Registrants who do not have SSN4 are significantly younger than those who do. In the 2016 file Indiana provided to Crosscheck 25.5% of the registrants born in 1980 or later have a SSN4 associated with their voter registration record; 52.0% born on or prior to 1979 have a SSN4 number. In the 2017 file, 21.9% of registrants born in 1980 or later have SSN4; 54.6% born on or prior to 1979 have a SSN4 number.[8]

Crosscheck matches are given confidence factor ratings by Quest Information Systems, an outside vendor. The Crossheck Pivot Table provides summary statistics for records with confidence factors of 70%, 75%, 90%, and 100%. The document "Confidence Factor Calculation Method.docx" describes the matching criteria related to these confidence factors. Unfortunately, this document does not appear to me to describe accurately the match algorithm Indiana election officials applied. For example, the illustration of a "Complete Match" that yields a confidence factor of 100% requires full social security numbers, but as described above, Crosscheck only provides to Indiana a characterization of SSN4 matches. I thus infer a 100% confidence factor for a Crosscheck match includes a match of first name, last name, date of birth, and SSN4.

Presumably, matches with 100% confidence factor are the gold standard for Crosscheck matching. These 100% confidence factor matches have the same first name, last name, date of birth and SSN4. Yet, in three years, county election officials rejected 141 of the 245 100% confidence factor matches that they reviewed, or 57.6%.

In other words, when Indiana voter registration officials investigate Crosscheck matches that Indiana indicates have the highest 100% confidence factor, they reject more than half of these matches as being a false positive match.

## 70% CROSSCHECK MATCHES APPEAR TO BE REVIEWED IN VIOLATION OF INDIANA POLICIES

I cannot determine from the document "Confidence Factor Calculation Method.docx" what information results in a Crosscheck match confidence factor of 70%, 75%, or 90%. I am troubled

---

[6] As I determined by examination of "IndianaCrossCheck_20160121102712.csv".
[7] As I determined by examination of "IndianaCrossCheck_20170116123853.csv".
[8] In making these calculations, I ignore any birth years less than 1900 or more than 1998 for the 2016 file and 1999 for the 2017 file.

by this poor documentation since it raised the possibility that arbitrary matching procedures are being applied to Crosscheck matches.

Furthermore, in my review of the documents provided to me, I note that Indiana does not appear to follow its policies regarding which Crosscheck matches are sent to county voter registration officials for review.

Page 4 of the document "Multi-State Voter List Maintenance Step-by-Step.pdf" indicates that only Crosscheck matches with a "confidence of 75% or greater" are loaded into the SVRS system for review by county voter registration officials.[9]

Yet, the Crosscheck Pivot Table identifies 4,588 Crosscheck matches with a confidence factor of 70% sent to county voter registration officials for review. County voter registration officials approved 3,587 or 78.2% of these Crosscheck matches.

Thus, the Crosscheck Pivot Tables identifies Crosscheck matches with less than a 75% confidence factor that county voter registration officials not only review, but frequently approve.

## FALSE NEGATIVE MATCHES

Another concern with exact matches, as employed by Indiana, is that two records that are associated with the same person do not match because the identifying information is not exactly the same, what is known as a false negative match.

Statisticians Ivan Fellegi and Alan Sunter published a seminal article on record matching in 1969.[10] As the field has matured, researchers and practitioners have developed new techniques to address the matching problem.[11] Scholars and practitioners generally recognize that matching records from two sources generated by different workflow processes is a difficult problem and can lead to mismatched records and that sound methods are needed to identify when two records may actually refer to the same individual.

The Social Security Administration Inspector General cautioned about using the Social Security Administration's Help America Vote Verification (HAVV) program. The SSA Inspector General concluded that "the HAVV program may indicate a no-match when a match does in fact exist in SSA records" and that the "high no-match response rate and inconsistent verification responses could hinder the States' ability to determine whether applicants should be allowed to vote."[12]

## CONCLUSIONS

It is my opinion that it is a near certainty that some Indiana registrants coincidentally share the same first name, last name, and date of birth as other states that participate in Crosscheck. This is

---

[9] See also: "2018 Indiana Voter Registration Guidebook", p. 34.
[10] Ivan Fellegi and Alan Sunter. 1969. "A Theory for Record Linkage." *Journal of the American Statistical Association* 64(328): 1183-1210.
[11] For a recent review, see: Ahmed K. Elmagrmid, Panagiotis G. Ipeirotis, and Vassilios S. Verykios. 2007. "Duplicate Record Detection: A Survey" *IEEE Transactions on Knowledge and Data Engineering* 19(1).
[12] Social Security Administration Inspector General. 2009. "Quick Response Evaluation: Accuracy of the Help America Vote Act Verification Program Responses" Report no. A-03-09-29115, p. 4.

born out in verification procedures conducted by Indiana county voter registration officials who either reject or fail to take action on 22.7% of all Crosscheck matches they are asked to review, and furthermore reject 57.6% of the matches with the highest 100% confidence factor that a match is supposedly valid.

There are clear indications that county voter registration officials are not performing the same quality of scrutiny to all matches provided by Crosscheck. Eleven counties accepted all Crosscheck matches provided to them. Conversely, one county has rejected less and 1% and another county has never investigated any matches. It is extremely unlikely these acceptance patterns are due to chance alone. These patterns suggest that some county voter registration officials approve all Crosscheck matches in bulk, while others pay little or no attention to them. These disparities are particularly troubling in light of Indiana's July 1, 2017 policy to cancel all approved Crosscheck matches.

I find evidence that Indiana is forwarding Crosscheck matches with less than a 75% confidence factor for review by county voter registration officials, contrary to state policies.

It is my opinion that some Indiana registered voters have their voter registration cancelled for no fault of their own due to a false match with a registered voter in another state. Furthermore, county voter registration officials' policies and processes to verify Crosscheck matches is haphazard, thus exposing Indiana registrants to different threats of having their voter registration summarily cancelled for no fault of their own.

As a consequence of these procedures, voter registrants who provide *less* identifying information to election officials are less likely to be arbitrarily cancelled from Indiana's voter registration system. A rational person may decide to provide the minimal necessary information on a voter registration application to protect their right to vote. Instead of enhancing the integrity of elections, Indiana's policy of cancelling voter registration records that county voter registration officials determine match with a record in another states may have the unintended consequence of leading to less information known about registered voters, and less integrity of the voter registration database.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 8, 2018                              _____
                                                                  Michael P. McDonald