UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COMMON CAUSE INDIANA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-03936-TWP-MPB |
| | ) | |
| CONNIE LAWSON, in her official capacity as | ) | |
| Secretary of State of Indiana, J. BRADLEY | ) | |
| KING, in his official capacity as Co-Director of | ) | |
| the Indiana Election Division, and ANGELA | ) | |
| NUSSMEYER, in her official capacity as Co- | ) | |
| Director of the Indiana Election Division, | ) | |
| | ) | |
| Defendants. | ) | |

ORDER GRANTING PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

This matter is before the Court on a Motion for Preliminary Injunction filed pursuant to Federal Rule of Civil Procedure 65 by Plaintiff Common Cause Indiana ("Common Cause") (Filing No. 75). Common Cause challenges the legality of Indiana Senate Enrolled Act 442 (2017) ("SEA 442"), codified at Indiana Code § 3-7-38.2-5(d)–(e), which amends Indiana's voter registration laws. The National Voter Registration Act of 1993, 52 U.S.C. §§ 20507–20511 ("NVRA"), established procedural safeguards to protect eligible voters against disenfranchisement and to direct states to maintain accurate voter registration rolls. The NVRA placed specific requirements on the states to ensure that these goals were met. Common Cause maintains that SEA 442 violates the NVRA by circumventing its procedural safeguards. Common Cause seeks preliminary injunctive relief to prohibit the Defendants from implementing or enforcing SEA 442. For the following reasons, the Court **grants** Common Cause's Motion for Preliminary Injunction.

# I.  <u>BACKGROUND</u>

The NVRA was enacted to reduce barriers to applying for voter registration, to increase voter turnout, and to improve the accuracy of voter registration rolls.  The NVRA allows a voter's registration to be removed from the rolls if the voter requests to be removed, if the voter dies, because of a criminal conviction or mental incapacity, or because of a change in residency.  The NVRA provides, "In the administration of voter registration for elections for Federal office, each State shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(a)(4).

The NVRA further provides, "Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform [and] nondiscriminatory." 52 U.S.C. § 20507(b)(1).  Furthermore, the NVRA directs,

> A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant-
>
>> (A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
>>
>> (B) (i) has failed to respond to a notice described in paragraph (2); and
>>
>> (ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

52 U.S.C. § 20507(d)(1).  Paragraph (2) describes that the notice must be "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address."  52 U.S.C. § 20507(d)(2).  Thus, in the context of removing voter registrations because of a change in residency, Section 20507(d)(1) requires that either (1) the voter confirm in

writing their change in residency, or (2) notice was mailed to the voter who then did not return the notice card and did not vote during the next two federal general elections.

Plaintiff Common Cause Indiana is the Indiana affiliate of Common Cause, which is a national nonpartisan, nonprofit grassroots organization that advocates for ethics, good government, campaign finance reform, constitutional law, and the elimination of barriers to voting. (Filing No. 74-24 at 1, ¶ 3.)  Common Cause works on multiple fronts, including by partnering with other community organizations to provide education and training to on-the-ground voting rights activists around the State of Indiana as well as by lobbying for nonpartisan redistricting and increasing the number of satellite voting locations. Common Cause has one fulltime employee and a limited budget, and it relies on its member volunteers for much of its activities. The organization has approximately 12,000 members who live and vote in Indiana (Filing No. 74-24 at 1–2).

Defendant Connie Lawson is the Indiana Secretary of State, and in that capacity she is the chief election official in the State of Indiana.  She is charged with performing all ministerial duties related to the state's administration of elections.  Ind. Code §§ 3-6-3.7-1, 3-6-4.2-2(a).

Defendants Bradley King ("King") and Angela Nussmeyer ("Nussmeyer") are co-directors of the Indiana Election Division within the Secretary of State's office, and in that capacity are jointly the "NVRA official" designated under Indiana law as responsible for the coordination of Indiana's responsibilities under the NVRA.  Ind. Code § 3-7-11-1; Filing No. 91-1 at 1; Filing No. 91-2 at 1.  These co-directors are individually appointed by the Governor based on recommendations from Indiana's Democratic and Republican parties, respectively.  *Id.*  Each co-director has a four-year term that coincides with the term of the Indiana Secretary of State.  *Id.* § 3-6-4.2-3.2.  King and Nussmeyer thus are charged with coordinating county voter registration.

Each county in the State of Indiana has either a county election board or a county board of registration.  Ind. Code §§ 3-6-5-1, 3-6-5.2-3.  Pursuant to the official policies, guidance, and standard operating procedures issued by King and Nussmeyer as the co-directors, the individual county boards conduct elections and administer election laws within their county. Ind. Code §§ 3-6-5-14, 3-6-5.2-6. The county boards are responsible for maintaining the voter registration records in their county by adding, updating, and removing voter registrations (Filing No. 74-1 at 7).  While the county boards are responsible for actually physically maintaining their voter registration records, this list maintenance is dictated by the policies, procedures, and guidance established by the election division co-directors and constrained by the election division's business rules governing the electronic statewide voter registration system (Filing No. 74-1 at 6–7).

King and Nussmeyer are additionally responsible for building, managing, and maintaining the statewide voter registration system, which includes creating protocols within the system and issuing official policies, guidance, and standard operating procedures to guide the county boards on their duties under state and federal law.  They also provide training to the county boards.  *Id.*; Ind. Code § 3-6-4.2-14. The official guidance from King and Nussmeyer as reflected in the protocols, documents, and trainings are mandatory (Filing No. 74-1 at 14).

King and Nussmeyer are also responsible for establishing the standard operating procedures and the business rules that determine how the electronic statewide voter registration system operates.  This includes dictating what information will be provided to county election officials to help them maintain their individual county voter rolls, and it also dictates what actions the county officials are able to take within the "online portal" of the statewide system (Filing No. 74-1 at 6–7, 19; Filing No. 74-4 at 7).

King and Nussmeyer receive and respond to questions from county election officials through telephone calls and emails. In advising county officials, they often respond to the county's inquiries independently and without consulting one another (Filing No. 74-1 at 8–9; *see also* Filing No. 74-7; Filing No. 74-8). They do not always agree on the required policies and procedures, including about voter registration and list maintenance, when they respond to inquiries from the counties (Filing No. 74-1 at 8–9). Nussmeyer and King ultimately relegate responsibility for NVRA compliance to the counties by directing counties to use their best judgment in implementing the instructions the co-directors provide. *Id.* at 6–7, 9.

Indiana participates in the Interstate Voter Registration Crosscheck Program ("Crosscheck") as a method for identifying voters who may have become ineligible to vote in Indiana because of a change in residence. Ind. Code § 3-7-38.2-5(d). Crosscheck is an interstate program that was created and is administered by the Kansas Secretary of State. The program is designed to identify voters who have moved to, and registered to vote in, another state. This is accomplished by comparing voter registration data provided by participating states. The participating states submit their voter registration data to Crosscheck, which then compares the first name, last name, and birthdate of registered voters to identify possible "matches" or duplicate voter registrations. The output data of possible matches is then sent back to the participating states. The individual states decide what to do with the Crosscheck data (Filing No. 74-10).

Each year Indiana provides its statewide voter registration list to the Kansas Secretary of State to compare to data from other participating states through Crosscheck. Crosscheck then sends a list of possible matches back to Indiana, and within thirty days of receiving the list, Indiana's statute requires that the "NVRA official" (in this case King and Nussmeyer) "shall provide [to] the appropriate county voter registration office" the name and any other information

obtained on any Indiana voters who share "identical . . . first name, last name and date of birth of [a] voter registered in [another] state."  Ind. Code § 3-7-38.2-5(d).  While the statute requires King and Nussmeyer to provide this voter data to the county election officials, they have acknowledged that they only forward the data to the county officials if the data meets a certain "confidence factor," which King and Nussmeyer determine based on additional matching data points, such as address, middle name, or social security number (Filing No. 74-1 at 11–12; Filing No. 74-4 at 8).  No data has been sent yet by King and Nussmeyer to the county election officials for the 2018 election cycle (Filing No. 79-2 at 3).

Once the county officials receive the voter data, they determine whether the voter identified as a possible match is the same individual who is registered in the county and whether the voter registered to vote in another state on a date after they had registered in Indiana.  Ind. Code § 3-7-38.2-5(d).  Within the statewide voter registration system, the county official may select for each possible matched voter registration "match approved," "match rejected," or "research needed." (Filing No. 74-11 at 6.)  The information provided from Crosscheck to the county officials in the statewide voter registration system is limited to the personal data of voters.  It does not include any underlying source documents (Filing No. 74-2 at 7–8).

The current configuration of the statewide voter registration system does not provide information about the dates of registration in Indiana and other states to assist in determining what state registration occurred first (Filing No. 74-11 at 6; Filing No. 74-1 at 13).  Some county officials just assume that the Indiana registration predates the other state's registration, which leads to cancelling the Indiana registration (Filing No. 74-3 at 11; Filing No. 74-2 at 9; Filing No. 74-6 at 9; Filing No. 74-5 at 13).  Even if dates of registration information was provided, this information is not complete or consistent because states that participate in Crosscheck do not always populate

the registration date field, and they have different policies in how they determine which date to use, so there is no uniform practice among states (Filing No. 74-4 at 9–10; Filing No. 74-1 at 16; Filing No. 74-12 at 2).

King and Nussmeyer do not provide guidance or a standardized procedure to the county election officials for how to determine whether the record of an Indiana voter is actually the same individual who is registered in another state or how to determine whether the out-of-state registration is more recent (Filing No. 74-4 at 13–14).  Some counties simply approve all matches that appear as possible matches from Crosscheck (Filing No. 74-13).  Each county has the discretion to cancel or not cancel a voter's registration based on their analysis of the data received from other states and Crosscheck (Filing No. 74-4 at 13).

The state statutory authority and directives upon which the above-described processes are based is found at Indiana Code § 3-7-38.2-5(d)–(e).  Prior to its amendment in 2017, Indiana Code § 3-7-38.2-5(d)–(e) read:

> (d) The NVRA official shall execute a memorandum of understanding with the Kansas Secretary of State. Notwithstanding any limitation under IC 3-7-26.4 regarding the availability of certain information from the computerized list, on January 15 of each year, the NVRA official shall provide data from the statewide voter registration list without cost to the Kansas Secretary of State to permit the comparison of voter registration data in the statewide voter registration list with registration data from all other states participating in this memorandum of understanding and to identify any cases in which a voter cast a ballot in more than one (1) state during the same election. Not later than thirty (30) days following the receipt of information under this subsection indicating that a voter of Indiana may also be registered to vote in another state, the NVRA official shall provide the appropriate county voter registration office with the name of and any other information obtained under this subsection concerning that voter, if the first name, last name, and date of birth of the Indiana voter is identical to the first name, last name, and date of birth of the voter registered in the other state. **The county voter registration office shall determine whether the individual: (1) identified in the report provided by the NVRA official under this subsection is the same individual who is a registered voter of the county; (2) registered to vote in another state on a date following the date that voter registered in Indiana; and**

**(3) authorized the cancellation of any previous registration by the voter when the voter registered in another state.**

(e) If the county voter registration office determines that the voter is described by subsection (d)(1) through (d)(3), the county voter registration office shall cancel the voter registration of that voter. **If the county voter registration office determines that the voter is described by subsection (d)(1) and (d)(2), but has not authorized the cancellation of any previous registration, the county voter registration office shall send an address confirmation notice to the Indiana address of the voter.**

(Emphasis added.)  However, SEA 442 amended this Code section effective July 1, 2017, which

now reads:

(d) The NVRA official shall execute a memorandum of understanding with the Kansas Secretary of State. Notwithstanding any limitation under IC 3-7-26.4 regarding the availability of certain information from the computerized list, on January 15 of each year, the NVRA official shall provide data from the statewide voter registration list without cost to the Kansas Secretary of State to permit the comparison of voter registration data in the statewide voter registration list with registration data from all other states participating in this memorandum of understanding and to identify any cases in which a voter cast a ballot in more than one (1) state during the same election. Not later than thirty (30) days following the receipt of information under this subsection indicating that a voter of Indiana may also be registered to vote in another state, the NVRA official shall provide the appropriate county voter registration office with the name of and any other information obtained under this subsection concerning that voter, if the first name, last name, and date of birth of the Indiana voter is identical to the first name, last name, and date of birth of the voter registered in the other state. **The county voter registration office shall determine whether the individual: (1) identified in the report provided by the NVRA official under this subsection is the same individual who is a registered voter of the county; and (2) registered to vote in another state on a date following the date that voter registered in Indiana.**

**(e) If the county voter registration office determines that the voter is described by subsection (d), the county voter registration office shall cancel the voter registration of that voter.**

(Emphasis added.)

SEA 442 has removed from the statute the requirement to determine whether the individual

voter authorized the cancellation of any previous registrations when they registered in another

state.  The amendment also removes the requirement to send an address confirmation notice to the

voter when cancellation has not been confirmed by the voter. Before the statute was amended, pursuant to business rules set by King and Nussmeyer, whenever a county official determined that a possible match was indeed truly a match and approved the match, that selection in the statewide voter registration system would generate a confirmation notice that was mailed to the voter. This mailing allowed a person to confirm their registration at the current address, update their registration, or cancel it. If the voter did not respond to the mailer, they would be placed in "inactive" status. After being placed in inactive status, only if the voter did not vote over the course of the next two federal general election cycles could Indiana cancel the voter's registration (Filing No. 74-4 at 14).

Also prior to the amendment, county officials were required to confirm that voters who appeared to have registered in another state had also authorized the cancellation of any previous registration by the voter when the voter registered in the other state. If the county official could not determine that the voter had authorized the cancellation of any previous registration, the state statute required the county board to send an address confirmation notice to the Indiana address of the voter. This was consistent with the written confirmation notice and waiting procedures in the NVRA at 52 U.S.C. § 20507(d). This requirement has been removed by SEA 442.

During the enactment process of SEA 442, Common Cause's single fulltime employee and policy director, Julia Vaughn, testified on behalf of Common Cause before the state legislature and also spoke with Lawson's general counsel to explain how SEA 442 would injure Indiana voters and threaten their right to vote as well as how it would violate the NVRA. These lobbying efforts took time away from other work and issues to which Common Cause could have devoted its time. After the statute's amendment, Common Cause has devoted time and resources to conducting activities such as training sessions aimed at educating voters and community activists about the

increased risk of erroneous voter registration cancelations. Because of SEA 442, Common Cause has changed some of its training materials to address the increased risk of voters being wrongly removed from the voter rolls (Filing No. 74-24 at 2, 4).

On October 27, 2017, Common Cause filed this lawsuit seeking declaratory and injunctive relief, requesting that the Court declare Indiana Code § 3-7-38.2-5(d)–(e) violates the NVRA and enjoining Indiana from implementing and enforcing the amended statute (Filing No. 1).   On March 8, 2018, Common Cause filed its Motion for Preliminary Injunction (Filing No. 74; Filing No. 75). On May 2, 2018, the parties presented oral argument to the Court on the Motion (Filing No. 95).

After this lawsuit was initiated, the Indiana General Assembly enacted House Enrolled Act 1253 ("HEA 1253"), which went into effect on March 15, 2018.  HEA 1253 added "confidence factors" to Indiana Code § 3-7-38.2-5(d), thereby codifying the Election Division's policy of providing to the county officials only those registrations that meet certain match criteria.

## II.   <u>LEGAL STANDARD</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008).  "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Id.* (citation and quotation marks omitted).  Granting a preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it."  *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citation and quotation marks omitted).

When a district court considers whether to issue a preliminary injunction, the party seeking the injunctive relief must demonstrate that "it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its

favor, and that issuing an injunction is in the public interest." *Grace Schs. v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015).  The greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

## III.   <u>DISCUSSION</u>

Congress enacted the National Voter Registration Act to enhance voting opportunities for every American.  Common Cause challenges the legality of SEA 442, codified at Indiana Code § 3-7-38.2-5(d)–(e), which amends Indiana's voter registration laws.  As noted above, the NVRA established procedural safeguards and mandatory procedures for state election officials which are designed to "increase the number of eligible citizens who register to vote in elections for Federal office;" "to protect the integrity of the electoral process;" and "to ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b)(1), (3)-(4).  Common Cause argues that SEA 442 violates the NVRA by circumventing its procedural safeguards—the notice-and-waiting period requirement, as well as the requirement that a state's list maintenance system be uniform and nondiscriminatory.  The Defendants assert that Indiana has gone to great lengths to ensure that it is both actively and justifiably removing those from its rolls who are no longer qualified to vote.  And as a failsafe, Indiana provides a simple process for any individual who may have been mistakenly removed to still vote, therefore, Common Cause's request for a preliminary injunction should be denied.

To obtain a preliminary injunction, Common Cause must establish the following four factors as to each provision it seeks to enjoin: "[1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that issuing an injunction is in the public interest." *Grace Schools*,

801 F.3d at 795.  The first two factors are threshold determinations; "[i]f the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'"  *Stuller, Inc.*, 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).  The Court will address the first two threshold factors in turn, before addressing the final factors.

A.      <u>**Likelihood of Success on the Merits**</u>

Common Cause argues that a preliminary injunction is appropriate because it will ultimately prevail on the merits, and without an injunction, Common Cause, its members, and thousands of other lawfully registered voters will suffer irreparable harm from the unlawful purging of voter registrations without notice.  It further argues that the Defendants must comply with the NVRA and, at a minimum, send confirmation notices before cancelling voter registrations based on change of residency and the Crosscheck data.  Because its proposed injunction would "eliminate[] a risk of individual disenfranchisement without creating any new substantial threats to the integrity of the election process," Common Cause asserts the balance of harms and public interest support granting the Motion.  *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388–89 (6th Cir. 2008); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12–13 (D.C. Cir. 2016).

The NVRA establishes requirements that states must satisfy when maintaining their voter registration rolls.  One such requirement is that a state "shall not remove" a voter from its list of eligible voters due to change in residence unless: (a) the voter confirms such a residence change in writing; or (b) the voter fails to respond to a confirmation notice with specific content prescribed by the statute and the voter does not vote in the jurisdiction during the next two federal election

cycles.  52 U.S.C. § 20507(d)(1).  These procedural safeguards of written confirmation from the voter or the notice and waiting period are in place to protect against wrongful disenfranchisement.

Common Cause asserts that, contrary to these plain requirements, SEA 442 requires King and Nussmeyer to provide county officials with data about every voter who Crosscheck identifies as a possible match.  After receiving this data produced by Crosscheck, the county officials "shall cancel the voter registration of that voter" immediately, without any notice and without waiting the two federal election cycles, if the county official believes that the duplicate records in Crosscheck belong to the same voter and that the voter's out-of-state registration post-dates the Indiana registration.

Common Cause argues that the Crosscheck system has inherent flaws and limitations, which makes it an unreliable source on which to base voter registration cancellations without further investigation.  It maintains that Crosscheck produces many false positives because many people have a matching first name, last name, and birthdate, but in reality, they are not the same person.  Crosscheck and the state's voter registration system is unreliable because they do not collect or disseminate the actual voter registration documents, thereby depriving states of the opportunity to verify the conclusory data with the underlying documents.  The system also has limited data and functionality, which reduces its reliability for county officials to cancel voter registrations based solely on Crosscheck and the data uploaded into the statewide voter registration system.

Additionally, the data definitions are not consistently used or applied by each of the participating states, and thus, some data may be missing or may be used in disparate ways by the different states.  This is especially true of the dates of registration.  Common Cause points out that, because of these inherent limitations with Crosscheck, historically, it has been used only as a

starting point in Indiana's voter cancellation process.  However, it appears that Crosscheck will now be used to determine whether a duplicate voter registration exists and then cancellation of the Indiana registration will promptly follow.

Common Cause is correct.  Before enactment of SEA 442, Indiana used Crosscheck matches as a starting point to determine whether a voter registration could be cancelled.  If there was a "match," county election officials would confirm whether the individual registered to vote in Indiana actually was the same individual registered to vote in another state.  The county official would then determine whether the registration in the other state occurred after the registration in Indiana.  Then the county official would determine whether the voter had authorized cancellation of any previous registrations.  If all these conditions were met, the county official would cancel the Indiana registration, but if the last condition was not met, the county official would mail a notice to the voter and provide the waiting period for an "inactive" voter.

Common Cause argues that SEA 442 violates the NVRA by removing the last condition: confirming that the voter authorized cancellation of any previous registrations.  It also argues that SEA 442 violates the NVRA by removing the notice and waiting period requirement where authorized cancellation has not been confirmed. As this relates to Crosscheck, Common Cause asserts that a Crosscheck "match" does not constitute a voter's authorization to cancel any previous registrations.  Crosscheck provides only second-hand information that should be accompanied with the notice and waiting period protection when the state does not have an affirmative authorized cancellation from the voter.  Even Nussmeyer warned the legislative aides working on the passage of SEA 442 that "federal law does not permit the cancellation" of voters from the registration rolls as mandated by SEA 442 (Filing No. 74-21 at 2).  Because SEA 442 eliminates

14

the requirement of written confirmation or a notice and waiting period, it violates the NVRA, and Common Cause asserts that it will prevail on the merits for this reason.

Common Cause also asserts that SEA 442 violates the NVRA because it is not a uniform approach to cleaning up voter registration rolls.  It is not uniform because the state does not provide enough specific guidance to the county election officials regarding how to determine whether a voter registration is a matched duplicate in another state.  The state also leaves it up to the county election officials to determine which voter registrations should be purged from the rolls, and those local county officials interpret and apply the standards and information differently.  Common Cause presents examples of how local officials apply the purging standards differently.  A Marion County official will send a notice and wait two election cycles before cancelling an Indiana voter registration if that official received a notice of registration from another state (Filing No. 74-3 at 13).  However, under these same facts, a Hamilton County official will immediately cancel the Indiana registration upon receipt of notification from another state (Filing No. 74-5 at 14–15). Some county officials explain that they will cancel registrations of "matched" individuals if the name is unusual but not if it is a common name (Filing No. 74-5 at 11–12; Filing No. 74-6 at 9).

Common Cause further argues that the state's approach is not uniform because the two state co-directors, King and Nussmeyer, provide different guidance to local county election officials when those county officials call one of the co-directors to ask questions about implementing voter regulations and laws. They often do not consult with each other about responses to provide to the county officials, and they occasionally do not agree with each other about policies and procedures.

Common Cause asserts that it has a high likelihood of success on the merits because SEA 442 plainly violates the NVRA's requirement to provide notice and a waiting period where the

voter has not already authorized cancellation of their previous registrations.  And additionally, it argues it will succeed on the merits because the state's approach to purging its registration rolls is not uniform or reasonable.

In response to Common Cause's argument, the Defendants first argue that Common Cause lacks standing because it has suffered no injury in fact.  The Defendants contend that Common Cause lacks standing on its own behalf because its choice of how to allocate its limited resources is not an injury inflicted by the Defendants, and it is an "injury" of its own making.  They argue that Common Cause's assertion of injury is highly speculative and cannot support standing.  Regarding organizational standing to represent its members, Defendants assert that the individual members do not have standing to sue in their own right because of a lack of injury to them and nobody has been deprived of the right to vote because of SEA 442.

The Defendants further argue that there is no threat of actual or imminent harm because it has not cancelled any voter registrations and will not do so before July 1, 2018, and even if a voter registration is cancelled, the voter will still be permitted to vote (albeit through the "alternative voting procedure").  The Defendants also argue that any alleged injury cannot be traced back to the named Defendants because the cancellation of voter registrations is carried out by county election officials, not the named statewide election officials.  Thus, the Defendants assert, there is no injury and no standing.

Concerning the merits of the claim, the Defendants assert that, even if standing could be established, the challenged statute complies with the requirements of the NVRA by establishing a procedure to remove voter registrations from the rolls when individuals have registered to vote in another state.  The Defendants note that the challenged statute has been amended yet again since Common Cause filed its Complaint.  The amendment took effect on March 15, 2018, but it has not

16

yet been implemented by King and Nussmeyer.  The amendment directs King and Nussmeyer to apply a set of "confidence factors"—*i.e.* additional personal information such as social security number, street address, driver's license number, zip code—to the data received from Crosscheck before sending the information to the county election officials, who then determine whether a registration should be cancelled.  The Defendants argue that the added measure of confidence factors allows them to more accurately determine that an individual is indeed the same person who is registered to vote in another state, and thus, the registration in Indiana can then be cancelled.

The Defendants argue removal of a voter's registration is permissible based on the voter's registration to vote in a different state because that registration in another state can be considered a request for removal from the voter rolls of previous states or can be considered a "confirmation in writing" that the voter has changed their residence.  The Defendants explain that SEA 442 plainly requires the county election officials to determine whether the voter has registered in a different state after the voter registered to vote in Indiana.  Because they confirm the subsequent registration in a different state, the county official can remove the voter from the rolls because that subsequent registration can be treated as a request for removal from Indiana's voter registration roll.  This same logic applies to the "confirmation in writing" aspect of the statute, which allows cancellation of the voter registration.  The Defendants assert that an out-of-state voter registration form is written confirmation of the voter's change in residency.  This is consistent with sections of the NVRA where registering in another state can be considered (1) a request for removal from the voter roll in their previous state of residence under 52 U.S.C. § 20507(a)(3)(A), or (2) a confirmation in writing that the registrant has changed residence under 52 U.S.C. § 20507(d)(1)(A).

The Defendants argue that there is uniformity among the county election officials because King and Nussmeyer provide training to them and also provide a manual of policies and procedures to give guidance. The county election officials are uniformly required to follow the law by determining whether the duplicate matches from Crosscheck are indeed the same person and then whether the out-of-state registration occurred after the Indiana registration. Then they may cancel the Indiana voter registration. This process allows the state and its election officials to give full faith and credit to the records of other states to determine that voters have changed their residence to other states.

Common Cause replies that the Defendants' standing argument lacks support in the law. The Supreme Court made clear that when an organization diverts its resources to counter the challenged conduct, "there can be no question that the organization has suffered injury in fact," and "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on [an] organization's resources—constitutes far more than simply a setback to [its] abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Common Cause also notes that the Seventh Circuit explicitly recognized this "diversion-of-resources" theory in *Crawford v. Marion County Election Board*. There, the court held that the Democratic Party had standing in its own right to challenge Indiana's photo ID law because it was "compelled" to divert its resources to combat the law's negative effects in order to achieve the organization's goals, and standing "requires only a minimal showing of injury." 472 F.3d 949, 951 (7th Cir. 2007). The diversion of its resources and the frustration of its mission are the precise injuries that Common Cause has suffered in this case. Common Cause asserts it also has standing because its members face a real threat to being disenfranchised by SEA 442.

Regarding the Defendants' assertion that any injury cannot be fairly traceable to them, Common Cause explains that the Defendants are the NVRA officials in the state and are ultimately responsible for the state's compliance with the NVRA.  Additionally, while the county election officials are responsible for physically cleaning up the registration rolls, the Defendants establish the policies and procedures for implementing Indiana election law, which directs and guides the county election officials' work.  A state's NVRA official is the proper defendant where the actual voter registration has been delegated to—and actual NVRA violations committed by—local officials.  *See Harkless v. Brunner*, 545 F.3d 445, 451–52, 455 (6th Cir. 2008).

Common Cause asks the Court to disregard the Defendants' irrelevant argument that they might provide future guidance to county officials that will be in compliance with the NVRA but not consistent with the language of the challenged statute.  As well, it argues the Court should disregard the misleading "confidence factors" argument because those factors do not reliably identify an actually matched voter registration.  These confidence factors do not address or resolve the issue of a lack of notice to voters when the voter has not confirmed anything in writing or asked to be removed.

Common Cause further replies that the Defendants' argument completely ignores the NVRA's requirement to provide notice and a waiting period when a voter has not confirmed in writing that the voter has changed residence. Rather, the Defendants wrongly argue that the simple act of registering in a different state is written confirmation of a change in residence.  The NVRA states that the written request or confirmation must come from the voter, yet the state's information is coming from Crosscheck, a third-party, not the voter.  Common Cause points out that where a state relies on third-party information—such as a change of address form provided by the United States Postal Service (which originated with the voter)—to determine that a voter has changed

19

residence, the NVRA requires that the state still use the notice and waiting period procedure.  Thus, the Crosscheck data cannot serve as a request from the voter to cancel previous registrations or be construed as authorization to cancel previous registrations.  Such data is not a request from the voter; a request from the voter would require that the voter ask to be removed from the voter rolls.  Similarly, Common Cause also argues that the Crosscheck data is not confirmation in writing from the voter.

Based on the case law cited by the parties, the Court first determines that Common Cause has standing to pursue its claim for declaratory and injunctive relief.  Common Cause has presented evidence that it already has been compelled to divert its resources to address SEA 442 and that its mission focus has been affected.  It has shown that injury is imminent after SEA 442 is implemented.  This diversion of resources has been determined sufficient to confer standing upon organizations, *Havens Realty Corp.*, 455 U.S. at 379, and standing "requires only a minimal showing of injury."  *Crawford*, 472 F.3d at 951.  The Defendants are the NVRA officials in the state and are responsible for the state's compliance with the NVRA.  Furthermore, they establish the guidelines, policies, and procedures for maintaining the state's voter registration rolls.  The local county election officials are required to follow the Defendants' directives.  Therefore, the injury in this case is fairly traceable to the named Defendants.  Therefore, Common Cause has standing to proceed.

Regarding the likelihood of success on the merits, the Court determines that Common Cause has a high likelihood of success on the merits of its claim that SEA 442 violates some of the requirements of the NVRA and threatens disenfranchisement of eligible voters.

The NVRA plainly requires that a state "shall not remove the name of a registrant from the official list of eligible voters . . . on the ground that the registrant has changed residence unless the

registrant," (1) "confirms in writing that [they have] changed residence," or (2) has failed to respond to a mailed notification and has not voted or appeared to vote in two federal election cycles. 52 U.S.C. § 20507(d)(1). These are simple procedural safeguards to protect registered voters, and states are required to follow these safeguards. Before its amendment by SEA 442, Indiana Code § 3-7-38.2-5(d)–(e) provided for the notice and a waiting period required by the NVRA when a voter did not confirm in writing of their change in residence or did not request to be removed from the voter rolls. SEA 442 removes this procedural safeguard. The Defendants' reliance on the new "confidence factors" is misplaced because they do nothing to address the NVRA's requirement in particular cases to provide for notice and a waiting period.

The act of registering to vote in a second state as determined by Crosscheck cannot constitute a written request to be removed from Indiana's voter rolls or a confirmation in writing from the voter that they have changed their address. A voter's act of registering to vote is simply that—a registration to vote. There is no request for removal, and the voter is not confirming for Indiana that they have had a change in residence. Notably this information is not coming from the voter but rather from Crosscheck, which may or may not be reliable. It is significant that the NVRA still requires the notice and waiting period before cancelling a voter registration when a change in address has been confirmed through the U.S. Postal Service, which might be more reliable than Crosscheck. The information provided by the U.S. Postal Service originates from the voter, yet notice and a waiting period are still required by the NVRA before cancelling the registration. 52 U.S.C. § 20507(c)(1). Because SEA 442 removes the NVRA's procedural safeguard required in particular cases of providing for notice and a waiting period, the Court determines that Common Cause has a high likelihood of success on the merits of its claim.

21

The Court briefly notes that it appears the implementation of SEA 442 will likely fail to be uniform based on the evidence that King and Nussmeyer provide differing guidance to county officials on how to determine whether a particular registered voter is a duplicate registered voter in a different state. This is also true based on the evidence that Indiana's 92 county officials are left to use wide discretion in how they determine a duplicate registered voter, and they have used that discretion in very divergent ways.

**B.**     **Irreparable Harm with No Adequate Remedy at Law**

Common Cause asserts that, in the context of a plaintiff organization, harm exists where the defendant's conduct has made it more burdensome for the organization to carry out its activities. *See Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264–65 (1991). Common Cause further asserts that an organization can establish that it has been harmed when the organization devotes its resources to correcting the defendant's actions. *See Havens Realty Corp.*, 455 U.S. at 379.

Common Cause argues that it will suffer irreparable harm without an injunction prohibiting implementation of SEA 442 because its organization's limited resources—especially staff and volunteer time—will be diverted to helping educate Indiana voters and ensuring that eligible voters are not disenfranchised. This will inevitably take away resources and time from other aspects of Common Cause's work and mission. Common Cause also argues an irreparable harm from the disenfranchisement of its members and other Indiana citizens, and courts regularly have determined that violating a person's right to vote (and other First Amendment rights) is an irreparable harm because an individual cannot vote after an election has passed. It points to numerous court opinions that have held violation of First Amendment rights and voter rights constitutes an irreparable harm without an adequate remedy at law. *McCutcheon v. Fed. Election*

22

*Comm'n*, 134 S. Ct. 1434, 1440–41 (2014) ("There is no right more basic in our democracy than the right to participate in electing our political leaders."); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."); *Elrod v. Burns*, 427 U.S. 347, 373–74, n.29 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury[,]" and "[t]he timeliness of political speech is particularly important."); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) ("for some kinds of constitutional violations, irreparable harm is presumed," especially with First Amendment claims); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (same); *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) (same); *Frank v. Walker*, 196 F. Supp. 3d 893, 917 (E.D. Wis. 2016) (disenfranchisement is an irreparable harm); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) (denying right to vote cannot be redressed after the fact); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (same); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Newby*, 838 F.3d at 12–13 (violation of NVRA is an irreparable harm).

The Defendants dispute that irreparable harm exists because SEA 442 has not yet been implemented, and when it is implemented, even if a voter is wrongfully removed from the registration rolls, they may still vote under the "fail-safe" provisions of Indiana's election law. Thus, they assert, nobody will be deprived of the right to vote.

Common Cause replies that SEA 442 has been enacted into law, and the Defendants have stated that they will start implementing it in July 2018. Harm has already been imposed on Common Cause by impacting its ability to fulfill its mission and by diverting its limited resources, but additional harm is imminent after the Defendants begin implementing the law.  Wrongful

disenfranchisement will occur, which is an irreparable harm.  Common Cause further replies that the Defendants' reliance on its "fail-safe" alternative voting procedure to justify SEA 442 is misplaced because the NVRA requires such a "fail-safe" voting procedure as an additional protection to voters, not as a replacement to the other requirements of the NVRA.

The Court first notes that the Defendants' argument that no irreparable harm exists because SEA 442 has not yet been implemented is unavailing.  The very purpose of a preliminary injunction is to prevent an imminent harm from occurring or to quickly abate an irreparable harm that has already begun.  Next, the Court agrees with Common Cause that the Defendants' "fail-safe" voting procedure cannot justify implementation of SEA 442 because the NVRA requires that "fail-safe" voting procedure as an additional protection to voters, not as a replacement or alternative to the other requirements of the NVRA.  The harm that occurs from eliminating one required procedural safeguard is not negated by the continued use of a different additional procedural safeguard.

As has been held by numerous other courts, the Court determines that a violation of the right to vote is presumptively an irreparable harm.  *See McCutcheon*, 134 S. Ct. at 1440–41; *Reynolds*, 377 U.S. at 555; *Elrod*, 427 U.S. at 373–74, n.29; *Ezell*, 651 F.3d at 699; *Newby*, 838 F.3d at 12–13.  Because an individual cannot vote after an election has passed, it is clear that the wrongful disenfranchisement of a registered voter would cause irreparable harm without an adequate remedy at law.

**C.      Balance of Potential Harms**

Common Cause argues that a balance of the potential harms from an injunction weighs heavily in favor of Common Cause.  Depriving eligible citizens of the right to vote is a very significant harm, while not allowing the state to purge voter registrations in a manner that short-circuits the NVRA's requirements causes no harm to the state.  Maintaining accurate voter

registration rolls is important and prescribed by the NVRA; however, the state has many procedures that allow it to reasonably and more accurately clean up its voter registration rolls such as using the statewide notification mailers or cancelling registrations based on death, incarceration, incapacity, or written request.

The Defendants respond that, when an injunction is sought against a political branch of government, public policy considerations favor denial of the injunction because judicial interference with a public program diminishes the scope of democratic governance, and the government's interests are presumed to be the public's interests. In this case, an injunction would hinder efforts to protect the integrity of the electoral process and to ensure accurate and current voter registration rolls.

Common Cause contends the Defendants' argument is nothing more than a vague desire to be free from "federal judicial micromanagement," and in reality, the Defendants will suffer no harm from an injunction. They have self-imposed a stay of enforcing SEA 442 without suffering any harm thus far, so an injunction will not cause them any harm.

The Court determines that the balance of equities weighs heavily in favor of granting an injunction for Common Cause. An injunction prohibiting the implementation of SEA 442 will not impose any new or additional harm or burdens on the Defendants concerning their efforts to maintain accurate voter registration rolls and to ensure fair elections. The Defendants still have numerous ways that comply with the NVRA to clean up the state's voter registration rolls. On the other hand, not issuing an injunction and allowing SEA 442 to be implemented risks the imposition of significant harm on Common Cause and its members through the disenfranchisement of rightfully registered voters.

**D.**     **Public Interest**

Common Cause explains that voting is a fundamental constitutional right that is protected by the First Amendment, *John Doe No. 1 v. Reed*, 561 U.S. 186, 224 (2010), and the Seventh Circuit has held that "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y*, 453 F.3d at 859. Common Cause points out that the United States Supreme Court has held that the public has a "strong interest in exercising the fundamental political right to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The public interest is best served by protecting the right to vote and not disenfranchising eligible voters. Common Cause argues that, because its proposed injunction would "eliminate[] a risk of individual disenfranchisement without creating any new substantial threats to the integrity of the election process," the balance of harms and public interest support issuance of an injunction. *U.S. Student Ass'n Found.*, 546 F.3d at 388–89.

Similar to their response regarding the balance of harms, the Defendants argue that the public interest is served by allowing SEA 442 to be implemented to ensure the integrity of voter registration rolls and the electoral process.

In reply, Common Cause asserts that there is no evidence indicating the 2018 election will not be fair, honest, or have integrity if the Defendants are not permitted to implement and enforce SEA 442. There is no basis to suspect that voter fraud will increase if SEA 442 is not implemented this year. The greater public interest is in allowing eligible voters to exercise their right to vote without being disenfranchised without notice.

The Court agrees with Common Cause that the greater public interest is in allowing eligible voters to exercise their right to vote without being disenfranchised without notice. If a voter is disenfranchised and purged erroneously, that voter has no recourse after Election Day. While the

26

Defendants have a strong public interest in protecting the integrity of voter registration rolls and the electoral process, they have other procedures in place that can protect that public interest that do not violate the NVRA.

**E.    Posting Bond**

Common Cause's final argument is that the issuance of a preliminary injunction will not impose any monetary injuries on the Defendants, and in the absence of such injuries, no bond should be required. *See Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). The Defendants failed to respond to the argument that no bond should be required. The Court agrees that no monetary injury will result from the issuance of an injunction, and the Defendants have not argued that a bond is appropriate. Therefore, Common Cause need not post a bond.

## IV.    CONCLUSION

Because each of the factors for the issuance of a preliminary injunction weighs in favor of Common Cause, the Court **GRANTS** Common Cause's Motion for Preliminary Injunction (Filing No. 75). Pursuant to Federal Rule of Civil Procedure 65(d), the Court **ISSUES A PRELIMINARY INJUNCTION** prohibiting the Defendants from taking any actions to implement SEA 442 until this case has been finally resolved. A similar ruling is issued in related case *Indiana State Conference of the National Association for the Advancement of Colored People, et. al. v. Lawson et al.,* 1:17-cv-2897-TWP-MPB. Common Cause need not post a bond.

   **SO ORDERED.**

Date:  6/8/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

27

DISTRIBUTION:

Chiraag Bains
DEMOS
cbains@demos.org

Matthew Richard Elliott
INDIANA ATTORNEY GENERAL
Matthew.Elliott@atg.in.gov

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
Jefferson.Garn@atg.in.gov

William R. Groth
FILLENWARTH DENNERLINE GROTH
& TOWE LLP
wgroth@fdgtlaborlaw.com

Dale E. Ho
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
dale.ho@aclu.org

Kyle Hunter
INDIANA ATTORNEY GENERAL
kyle.hunter@atg.in.gov

Matthew Jedreski
DAVIS WRIGHT TREMAINE LLP
mjedreski@dwt.com

Kate Kennedy
DAVIS WRIGHT TREMAINE LLP
katekennedy@dwt.com

Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
slakin@aclu.org

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Diana Lynn Moers Davis
INDIANA ATTORNEY GENERAL
diana.moers@atg.in.gov

Stuart C. Naifeh
DEMOS
snaifeh@demos.org

Aleksandrina Penkova Pratt
INDIANA ATTORNEY GENERAL
aleksandrina.pratt@atg.in.gov

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Christine A. Roussell
DAVIS WRIGHT TREMAINE LLP
christianeroussell@dwt.com

Kelly Suzanne Thompson
INDIANA ATTORNEY GENERAL
kelly.thompson@atg.in.gov

L. Danielle Toaltoan
DAVIS WRIGHT TREMAINE LLP
danielletoaltoan@dwt.com