# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

September 18, 2019

To:     Laura A. Briggs
        UNITED STATES DISTRICT COURT
        Southern District of Indiana
        United States Courthouse
        Indianapolis , IN 46204-0000

| | |
|---|---|
| No. 18-2491 | COMMON CAUSE INDIANA,<br>Plaintiff - Appellee<br><br>v.<br><br>CONNIE LAWSON, in her official capacity as Secretary of State of Indiana, et al.,<br>Defendants - Appellants |
| No. 18-2492 | INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,<br> Plaintiffs - Appellees<br><br>v.<br><br>CONNIE LAWSON, et al.,<br> Defendants - Appellants |

| Originating Case Information: |
|---|
| District Court No: 1:17-cv-03936-TWP-MPB<br>Southern District of Indiana, Indianapolis Division<br>District Judge Tanya Walton Pratt |
| Originating Case Information: |

District Court No: 1:17-cv-02897-TWP-MPB
Southern District of Indiana, Indianapolis Division

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:          No record to be returned

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                    **Received by:**

_____9/18/2019_____                    _____

                                            Deputy Clerk, U.S. District Court

form name: **c7_Mandate**(form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**CERTIFIED COPY**

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

**FINAL JUDGMENT**

August 27, 2019

Before:    DIANE P. WOOD, Chief Circuit Judge
           MICHAEL B. BRENNAN, Circuit Judge
           AMY J. ST. EVE, Circuit Judge

| | |
|---|---|
| Nos. 18-2491 & 18-2492 | COMMON CAUSE INDIANA, INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, and LEAGUE OF WOMEN VOTERS OF INDIANA, INC.,<br>Plaintiffs - Appellees,<br><br>v.<br><br>CONNIE LAWSON, in her official capacity as Secretary of State of Indiana, et al.,<br>Defendants - Appellants |

**Originating Case Information:**

District Court Nos: 1:17-cv-03936-TWP-MPB & 1:17-cv-02897-TWP-MPB
Southern District of Indiana, Indianapolis Division
District Judge Tanya Walton Pratt

The judgments of the District Court are **AFFIRMED**, with costs, in accordance with the decision of this court entered on this date.

form name: **c7_FinalJudgment**(form ID: **132**)

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

## In the
## United States Court of Appeals
### For the Seventh Circuit

_____

Nos. 18-2491, 18-2492

COMMON CAUSE INDIANA, INDIANA STATE CONFERENCE OF THE
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED
PEOPLE, and LEAGUE OF WOMEN VOTERS OF INDIANA, INC.,

*Plaintiffs-Appellees*,

*v.*

CONNIE LAWSON, in her official capacity as Secretary of State
of Indiana, *et al.*,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
Nos. 1:17-cv-03936-TWP-MPB, 1:17-cv-02897-TWP-MPB —
**Tanya Walton Pratt**, *Judge*.

_____

ARGUED JANUARY 14, 2019 — DECIDED AUGUST 27, 2019

_____

Before WOOD, *Chief Judge*, and BRENNAN and ST. EVE, *Circuit Judges*.

WOOD, *Chief Judge*. Voting is at once an intensely personal act and a choice to participate in the collective process of representative democracy. It cannot take place, however, without

2                                    Nos. 18-2491 & 18-2492

an elaborate administrative infrastructure. This case concerns
that machinery—in particular, the process that Indiana wants
to use to cleanse its voter rolls of people it suspects no longer
qualify to vote there. Senate Enrolled Act 442 ("Act 442"),
which was passed in 2017 and codified at Indiana Code § 3-7-
38.2-5(d)–(e), adopted an aggressive new strategy for this pur-
pose, allowing Indiana immediately to remove a voter based
on information received from a third-party database rather
than in response to direct contact with the voter. Several or-
ganizations promptly challenged Act 442 in court, asserting
in two separate actions that it violates the National Voter Reg-
istration Act. They sought a preliminary injunction against
the implementation of the new law while both cases pro-
ceeded. Finding that the plaintiffs were likely to succeed on
the merits and that they would suffer irreparable injury if the
law were to take effect immediately, the district court issued
preliminary injunctions "prohibiting the Defendants from
taking any actions to implement [Act 442]" until the cases are
concluded.

The state appealed the injunctions to this court, see 28
U.S.C. § 1292(a)(1), and we consolidated the two cases for de-
cision. We conclude that the plaintiff organizations in each
case adequately demonstrated their standing to bring these
actions and that the district court did not abuse its discretion
by granting preliminary relief. We therefore affirm.

## I

### A

It is largely the responsibility of the states to set up and
operate the machinery necessary for voting. Article I, section
4, clause 1, of the federal Constitution allows state legislatures

to prescribe the "Times, Places and Manner" of holding elections for U.S. senators and representatives. Nonetheless, the federal Constitution places certain limits on the states' choices. Several amendments protect the franchise of certain groups (the Fifteenth, for racial groups; the Nineteenth, for women; and the Twenty-Sixth, for those who have reached age 18), while another amendment assures that a poll tax cannot stand in the way of voting (the Twenty-Fourth). Importantly, however, the case before us does not present an issue under any of those amendments. It turns instead on one of the laws Congress enacted pursuant to the language in Article I, section 4, clause 1, stating that "Congress may at any time by Law make or alter such [state] Regulations, except as to the Places of choosing Senators." That law is the National Voter Registration Act (NVRA), 52 U.S.C. §§ 20501–11.

Congress made no mystery of its purposes for passing the NVRA. It stated them in the opening section of the statute:

> (b) Purposes
> The purposes of this chapter are—
>> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
>> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
>> (3) to protect the integrity of the electoral process; and
>> (4) to ensure that accurate and current voter registration rolls are maintained.

*Id.* at § 20501(b). This case is primarily concerned with the fourth of those purposes—the maintenance of accurate and current voter registration rolls.

Several sections of the law address national procedures for voter registration. Those procedures start with section 20503, which requires states to allow registration for federal elections in several ways, including through the motor vehicle license process (section 20504), by mail (section 20505), or in person through a voter registration agency (section 20506). But the section of greatest interest to us is 20507, which contains "[r]equirements with respect to administration of voter registration"—here, maintenance of the voter registration rolls. As does the NVRA as a whole, this part of the law reflects two competing concerns: on the one hand, the need to ensure the integrity of the electoral process, §§ 20501(b)(3)–(4); and on the other hand, the need to increase voter registration and enhance voter participation, §§ 20501(b)(1)–(2).

The NVRA sets the boundaries within which states must operate when they administer the voter-registration process. It requires states to update their voter-registration rolls, section 20507(a)(4), but it also forbids states from removing voters from the official lists of eligible voters except under prescribed circumstances, section 20507(a)(3). A voter may request that his or her name be taken off the rolls, section 20507(a)(3)(A), but in the absence of such a request, if a state wants to remove a name because it suspects that the voter has moved, it must follow the procedures spelled out in section 20507(d). Because of its importance to this case, we set out the lengthy text of that section in a footnote.[1] The critical

---

[1] The statute reads as follows:

(d) Removal of names from voting rolls

fact here is that the *registrant* must inform the state about the change in residence, or the *registrant* must fail to respond to a notice sent by the state inquiring about continued eligibility.

---

(1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—

    (A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

    (B)(i) has failed to respond to a notice described in paragraph (2); and

      (ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

(2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

    (A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

    (B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

(3) A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

52 U.S.C. § 20507(d).

Moreover, it is not enough for the registrant to fail to respond to the state's notice. That person's name cannot be removed from the rolls, according to section 20507(d)(1)(B)(ii), until the state can show that the person did not vote or appear to vote in an election during the period beginning on the date of the notice and ending on the day after the *second* general election for federal office thereafter.

## B

In Spring 2017, the Governor of Indiana signed into law Act 442, which was designed to revamp the way Indiana updates its voter-registration lists. (The law was later codified at Indiana Code § 3-7-38.2-5(d)–(e), but in keeping with the practice in this case, we refer to it by its legislative name.) Act 442 was far from Indiana's first effort to ensure the accuracy of its official list of voters. At the time the law was passed, the state relied on a third-party database known as Crosscheck, which aggregates voter data from multiple states to identify potential duplicate voter registrations. Participating states could then follow up on the Crosscheck matches by sending the NVRA-required notices to the voters whose names potentially appeared on more than one state's voter rolls. Act 442 was designed to use Crosscheck more robustly by allowing Indiana *automatically* to remove a voter from the rolls if the voter was identified as a database "match" with a certain level of confidence. Act 442 made no provision for contacting the voter or confirming her wish permanently to change domicile and cancel her Indiana registration.

Act 442 was immediately challenged in two separate lawsuits by three different voter-advocacy organizations: The Indiana National Association for the Advancement of Colored People (NAACP), the League of Women Voters of Indiana

(the League), and Common Cause Indiana (CCI) (collectively "the Organizations"). The defendants are Connie Lawson, Secretary of State of Indiana; J. Bradley King, Co-Director of the Indiana Election Division in the Secretary's office; and Angela Nussmeyer, Co-Director of the Indiana Election Division. The Organizations sued all defendants in their official capacity only; we refer to them collectively as Indiana. In both cases, the Organizations contend that Act 442 violates the NVRA insofar as it allows Indiana to remove voters from the rolls without following the procedures specified by the federal statute. The Organizations obtained substantively identical preliminary injunctions that prevent Act 442 from going into effect while the cases are pending.

Indiana would like us to lift those injunctions. We conclude, however, the district court was correct to find that the Organizations are likely to succeed on the merits of their challenge, that they and their members will be irreparably harmed if the law goes into effect temporarily, that the state will not be materially injured if the lists are not subjected to this extra layer of purging immediately, and that the public interest favors compliance with the NVRA.

## II

Before we may reach the merits of the injunctions, we must address Indiana's challenge to the Organizations' Article III standing. The Organizations claim standing on their own behalf, as well as on behalf of their members. We start—and for the most part finish—with the Organizations' standing to raise their own claims. To assert standing for injunctive relief, they must show that they are under an actual or imminent threat of suffering a concrete and particularized "injury in fact"; that this injury is fairly traceable to the defendant's

conduct; and that it is likely that a favorable judicial decision will prevent or redress the injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The plaintiffs bear the burden of establishing each of these elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). We evaluate legal questions *de novo* and review any factual determinations necessary to resolve the Organizations' standing for clear error. *Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004).

A

On appeal, Indiana challenges only the district court's conclusion that the Organizations made a compelling enough showing of injury in fact to show Article III standing at this stage. We too therefore focus on injury in fact. (We briefly address causation and redressability below, as all three requirements affect our jurisdiction.)

The leading case for this purpose is *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). It addressed the right of an organization, Housing Opportunities Made Equal (HOME), to sue an apartment owner under the Fair Housing Act for racial discrimination. HOME employed "testers" to apply for rental apartments, to determine whether the apartment owners were engaged in conduct forbidden by the Act. When the testers uncovered racial steering by defendant Havens, HOME and the testers brought a suit under the Fair Housing Act. The defendant challenged HOME's Article III standing; but the Supreme Court found that HOME did have standing in its own right:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for

> low-and moderate-income homeseekers, there
> can be no question that the organization has suf-
> fered injury in fact. Such concrete and demon-
> strable injury to the organization's activities—
> with the consequent drain on the organization's
> resources—constitutes far more than simply a
> setback to the organization's abstract social in-
> terests….

455 U.S. at 379. Following *Havens*, we recognized in *Crawford v. Marion County Election Board*, 472 F.3d 949 (7th Cir. 2007), *aff'd on other grounds*, 553 U.S. 181 (2008), that a voting law can injure an organization enough to give it standing "by compel-ling [it] to devote resources" to combatting the effects of that law that are harmful to the organization's mission. *Id*. at 951. We found there that a political party had standing to chal-lenge an Indiana voting law. That law, we accepted for the preliminary standing inquiry, likely discouraged some of the party's supporters from voting. The law thus struck directly at the organization's mission and forced it to spend resources to get discouraged voters to the polls. *Id*. In affirming our de-cision, the Supreme Court stated in a footnote that: "[w]e also agree with the unanimous view of those judges that the Dem-ocrats have standing to challenge the validity of [the law] …." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189 n.7 (2008).

Nothing in the Supreme Court's later standing jurispru-dence has undermined the holdings of *Havens* or *Crawford*, which are therefore binding on us. To the contrary, the Court cited *Havens* with approval in 2017, in *Bank of America Corp. v. City of Miami, Florida,* 137 S. Ct. 1296, 1303 (2017), where it noted that the Fair Housing Act allows suits by "a nonprofit

organization that spent money to combat housing discrimination." *Id.* The Court likewise emphasized that organizations may rely on not only actual, but imminent harm for standing, including by challenging laws pre-enforcement if the organization can show a substantial threat of injury. Thus, in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), the Court ruled that an organization dedicated to pro-life advocacy adequately alleged injury in fact for Article III purposes when it challenged a state law prohibiting certain "false statements" made during political campaigns. *Id.* at 151–52, 161. It based that finding not on anything the organization had already done, but instead on specific statements that it intended to make in future election cycles.

Importantly, neither *Havens, Crawford,* nor the present case involves any effort to rely on something as amorphous as taxpayer standing or speculative injury. See *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) (no taxpayer standing); *Clapper v. Amnesty Intern. USA*, 568 U.S. 398 (2013) (speculative injury). In *Valley Forge*, the Court held that an atheist organization could not show injury in fact based solely on "the depriv[ation] of the fair and constitutional use of [its] tax dollar." 454 U.S. at 476. See also *Hein v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587 (2007) (no standing for organization that complained about spending federal money to promote faith-based initiatives); *United States v. Richardson*, 418 U.S. 166 (1974) (no taxpayer standing to challenge reporting under the Central Intelligence Agency Act of 1949). In *Clapper*, the Court held that the organizational plaintiff had failed to show that the injury it feared (surveillance of its international communications) was concrete enough to support standing. 568 U.S. at 411–14. The Court also found that the plaintiffs could not rely for

standing on the "costly and burdensome measures to protect the confidentiality of their communications" that they felt compelled to take, because they had not shown the situation was imminent, or as the Court put it, "certainly impending." *Id.* at 416.

The complaints and supporting materials presented by the Organizations in the present cases do not suffer from those defects. This is not a taxpayer case, and the injury the Organizations describe is either imminent or has already begun; it is concrete, ongoing, and likely to worsen. *Havens* and *Crawford* are thus the most pertinent authorities, and each Organization put forward evidence to support standing based on the kind of organizational injuries upheld in those cases.

Each Organization is a non-profit entity that advocates for voter access, conducts voter education to promote voter access, helps voters overcome any challenges they face trying to vote, and helps voters register to vote (or re-register if needed). CCI Complaint ¶¶ 60, 62; NAACP/League Complaint ¶¶ 6–11. Extrapolating from their experience assisting people who were erroneously dropped from the rolls, the Organizations expect that if Act 442 is allowed to go into effect and the state starts removing eligible voters from the rolls without notice, errors are inevitable, and the Organizations will be forced to spend resources cleaning up the mess. CCI Complaint ¶ 60; NAACP/League Complaint ¶¶ 8, 11. Beyond this, the NAACP and the League predict that some of the very voters they registered will be erroneously un-registered. NAACP/League Complaint ¶¶ 8, 11. CCI claims already to have expended resources educating voters and community activists about Act 442 and the enhanced risk of erroneous voter removal. CCI Complaint ¶ 60.

In support of their motions for preliminary injunctions, the Organizations submitted declarations and affidavits from the NAACP President, Barbara Bolling-Williams, the League's Co-President, Oscar Anderson, and the Policy Director of CCI, Julia Vaughn. This evidence expands on the general picture painted in the Organizations' complaints of the likely work Act 442 will create for them. Bolling-Williams explains, for example, how Act 442 "will cause [the NAACP] to expend [its] limited financial resources on rolling back the effects of the bill." Bolling-Williams Declaration ¶ 21. She describes the NAACP's work as including voter-registration drives and deploying volunteers who provide voter support on Election Day with issues including "registration cancellations." *Id.* ¶¶ 7, 10–11. Bolling-Williams expects that the NAACP will have to expand "voter education and poll monitoring programs to address the effects of the law should it go into effect." *Id.* ¶ 22. The NAACP is further concerned that any chaos created at polling places by Act 442 would exacerbate existing disparities in polling place resources with harmful effects such as long lines and undermine the NAACP's work to combat those disparities on Election Day. *Id.* ¶¶ 19–21.

Anderson's declaration describes the League's work "educating the public on voting rights." Anderson Declaration ¶ 5. Anderson calls the League's work registering voters "vital" and "critical" to the organization. *Id.* ¶¶ 8, 10. After the League registers a voter, volunteers often follow up with the voter, "give them other information about elections," or remind them of upcoming elections. *Id.* ¶¶ 13–14. According to Anderson, because of its concern about Act 442's imminent effect, "the League has already devoted resources to ensuring that voters are checking their registrations to make sure they

have not been purged." The League "created a poster and a resource on [its] website encouraging voters to check their registration status." *Id.* ¶ 22. As Anderson puts it, "[a]ny time League members spend addressing the risk of the voter purge by educating voters or re-registering purged voters takes away time and resources that could otherwise be spent registering voters or assisting voters with other purposes." *Id.* ¶ 32.

Speaking for CCI, Vaughn states in her declaration that the organization knows that it will receive calls from voters identified by the Crosscheck program, because it already does. Even now CCI receives calls from voters who received "cancellation notices" under Indiana's current system because Crosscheck identified them as potential duplicates. Vaughn Declaration ¶ 14. The targeted voters often seek out CCI for advice. *Id.* CCI expects to get even more calls from voters who discover that they have been dropped without notice—though more, and more frantic ones—up to and including on Election Day. *Id.* ¶¶ 14–17, 26. CCI trains volunteers to serve as Election Day poll monitors who answer voter questions, including those about erroneous cancellations of registration. *Id.* ¶ 16.

Demonstrating that the Organizations are not imagining things, the record shows that CCI already has "devoted additional time and resources to ameliorating the its [*sic*] effects of this law, including conducting activities such as training sessions aimed at educating voters and community activists about the increased risk of erroneous voter registration cancellations." *Id.* ¶ 19. Vaughn reports that "because of Act 442, [CCI] has had to change its curriculum" and "spend a greater portion of the fixed amount of time we have for [training ses-

sions] on discussing Act 442's effects, which necessarily diverts from the time we could spend talking about other issues." *Id.* ¶ 24. The more time and resources that CCI spends addressing the effects of Act 442, the less it has "to assist voters with other poll access issues," *id.* ¶ 28, and the rest of its advocacy agenda, which extends far beyond voter registration, *id.* ¶ 29.

According to the evidence put forward by the Organizations, Act 442 has created a culture of voter confusion, and it has already inflicted costs on them. Were Act 442 to take effect, the Organizations expect further concrete and specific adverse consequences: they will be required to increase the time or funds (or both) spent on certain activities to alleviate potentially harmful effects of Act 442, such as voter confusion, erroneous registration removal, and chaos at the polling place; and their missions will be thwarted, because even with those extra efforts, confusion around Act 442 and the need to combat it will displace other projects they normally undertake. This is enough to allege injury in fact.

We are not alone in this assessment. Our sister circuits have upheld the standing of voter-advocacy organizations that challenged election laws based on similar drains on their resources. Like us, they have found that the organizations demonstrated the necessary injury in fact in the form of the unwanted demands on their resources. See *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1164–65 (11th Cir. 2008) (upholding standing for voting-rights organizations to challenge voting law because "[t]he organizations reasonably anticipate that they will have to divert personnel and time to educating volunteers and voters on compliance with Subsection 6 and to resolving the problem of voters left

off the registration rolls on election day"); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (NAACP had standing to challenge a photo ID law based on diversion of resources from regular activities to educating voters about the new requirements and helping them get IDs); *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014) (organizations engaged in voter registration had standing to challenge program designed to remove non-citizens from the roll because they diverted resources to addressing problematic mis-identification of citizenship); *Scott v. Schedler*, 771 F.3d 831, 836–39 (5th Cir. 2014) (NAACP had standing to challenge failure to provide registration forms to persons visiting benefit offices because NAACP spent additional time on registration drives as a result); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (organizations had standing based on additional resources spent assisting people who should have been registered through state public assistance offices with voter registration); *Northeast Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016) (organization that helped homeless voters had standing to challenge a change in law that required it to overhaul its voter-education and get-out-the-vote programs to focus on early in-person voting instead of mail-in voting); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (upholding organizational standing for non-profit Organization for Chinese Americans based on injury—albeit "not large" one—resulting from extra time spent educating voters about a new Texas voting law restricting interpretation assistance instead of organization's normal "get out the vote" activities with membership); see also *Hispanic Interest Coal. of Alabama v. Governor of Alabama*, 691 F.3d 1236, 1243–44 (11th Cir. 2012) (im-

migration rights advocacy organization had to spend additional time and money educating community about the effects of new immigration law on its ability to enroll children in school).

## B

Indiana says that it accepts the evidence presented here, but it insists that even if true, this evidence does not add up to a proper showing of any injury to the Organizations, much less injury resulting from Act 442. It argues that advocacy organizations such as the plaintiffs cannot be "injured" by doing precisely the kind of work for which they were created. We can break this argument down into three separate points.

### 1.  More of a Bad Thing

First, Indiana contends that the Organizations have not shown that their conceded drain of resources should be considered an "injury." All they allege, as Indiana sees it, is that because of Act 442, they had to engage in more work, but work that is still within the Organizations' missions. Indiana concludes that such a consequence cannot possibly be an "injury." Indiana asks, in other words, "[h]ow can an organization have a legally protected interest in *not* spending money to advance its core mission?" *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1224 (9th Cir. 2012) (Ikuta, J., concurring and dissenting). Essentially Indiana says that by passing an election law with the alleged potential to confuse or disenfranchise voters, it did the Organizations a favor, by giving them more of the work they were created to do. It suggests that this is akin to a tax-preparation business saying that it is injured by a change in tax law that created more business for it.

It is hard to take that analogy seriously. Unlike the tax-preparation business, which presumably hopes to thrive for many years, the Organizations would like nothing better than to go out of business because all voter suppression has ceased, the system is running perfectly, and 100% of the electorate is registered and votes. But we do not know of any state that comes close to meeting that standard. In the imperfect world we inhabit, the Organizations have a specific mission: educating potential voters, helping them to fulfill whatever legal requirements their state has legitimately imposed as a condition of voting, and opposing any improper voter-suppression measures that may exist. In a world of limited resources—that is, the real world—the Organizations must decide which tasks will achieve those goals most effectively. Even the tax preparers must decide when and whether to modernize their software, move to a new office, advertise, hire a new associate, or quietly shrink. Indiana's legislation, the Organizations assert, will force them to reduce or eliminate their work in certain areas—voter education, get-out-the-vote efforts, and new registrations—so that they can make sure existing voters are not tossed off the rolls erroneously and without any notice. Under *Havens*, those are concrete injuries. See also *Crawford*, 472 F.3d at 951 (describing this as an "added cost" to organizations). If Act 442 goes into force, the Organizations will need to undertake the extra efforts they describe and cease other activities. By adding to their workload, Act 442 costs them time and money they would have spent differently or not spent at all.

2.   Diversion of Resources

Indiana also argues that the Organizations do not have standing because they have not really "diverted" any resources. Indiana interprets *Havens* as requiring a seismic shift

from work within the organization's mission to work outside of it, to support Article III standing. Because voter advocacy is central to each of the Organizations' missions, Indiana argues that any resources they spend on Act 442 are not a "diversion" of resources as contemplated by *Havens*.

In making this argument, the state is ignoring both the language and the holding of *Havens*. The plaintiff organization in that case, HOME, was a non-profit devoted to assuring equal housing opportunity. It operated a housing counseling service, and it investigated complaints of housing discrimination. 455 U.S. at 368. As we noted earlier, the Supreme Court found that the impairment of its ability to do work *within* its core mission was enough to support standing. *Id.* at 379.

If injury to HOME's fair-housing activities counted for standing, as it did, we see no reason why injury to the NAACP's, CCI's, and the League's voter programs does not equally support standing. Indeed, several other circuits interpret *Havens* as *requiring* an initial showing that the challenged conduct frustrate the organization's mission. See *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Any work to undo a frustrated mission is, by definition, something in furtherance of that mission. We too have recognized that an organization's mission must be related to the remedial measures taken. See *Keep Chicago Livable v. City of Chicago*, 913 F.3d 618, 625 (7th Cir. 2019) (rejecting an attempt to claim a drain-on-resource injury without a "clear nexus to any … interest of the organization"). Indeed, we have a hard time imagining—nor has Indiana explained—why it is that an organization would undertake any additional work if that work had nothing to do with its mission. And it would be an

inside-out world indeed if organizations had standing to assert only interests that they shared with the general public.

That is not to say that organizations have standing based solely on the baseline work they are already doing. They "cannot convert [] ordinary program costs into an injury in fact." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). The question is what additional or new burdens are created by the law the organization is challenging. *Nat'l Council of La Raza*, 800 F.3d at 1040–41. It must show that the disruption is real and its response is warranted. See *OCA-Greater Houston*, 867 F.3d at 611–12 (recognizing that activities cannot support organizational standing if they are "no different from the plaintiffs' daily operations"); see also *Food & Water Watch, Inc.*, 808 F.3d at 919–20 (organization does not suffer an injury in fact unless there is an inhibition of daily operations or operational costs beyond normal). Compare *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–61 (6th Cir. 2014) (no standing where the alleged injury was the provision of training that the organization was already providing, where a sought-after change in the law would change only the content of the training), with *Northeast Ohio Coal. for the Homeless*, 837 F.3d at 624 (distinguishing *Fair Elections Ohio v. Husted* and finding standing by emphasizing that the plaintiffs were challenging a newly enacted law whose changes meant the organization had to overhaul its strategies), and *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1242 (9th Cir. 2018) (overhaul that included "developing new training materials" and "significant training of existing staff" in response to change in law was sufficient for standing). The Organizations in this case have shown that Act 442's effect on their work goes far beyond "business as usual." They have done so through concrete evidence showing that Act 442 is already disrupting

their operations, and if it goes into effect, it will likely require them significantly to change or expand their activities.

### 3. Causation

Indiana next contends that any injury the Organizations will suffer from Act 442 is self-inflicted. As the district court put it, the state asserts that the Organizations' "choice of how to allocate their limited resources is not an injury inflicted by the Defendants, it is an 'injury' of Plaintiffs' own making." *Indiana State Conference of Nat'l Ass'n for Advancement of Colored People v. Lawson*, 326 F. Supp. 3d 646, 658 (S.D. Ind. 2018). This argument finds no support in the record. Moreover, it ignores the vital role that causation plays in the standing inquiry. The Eleventh Circuit rejected a similar argument in *Browning*:

> The Secretary attempts to draw a distinction between an act or law negating the efforts of an organization, which is admittedly an injury under *Havens*, and an act or law merely causing the organization to voluntarily divert resources in response to the law, which he claims is not an injury cognizable under Article III. This distinction finds no support in the law, and it misses the point.

522 F.3d at 1166. As the Eleventh Circuit explained, *Havens* teaches that courts must focus on those drains in resources that "arise[] from" the organization's need to counteract the defendants' allegedly illegal practices, making that drain "simply another manifestation of the injury to the organization's noneconomic goals." *Id.* (quotation marks omitted). What matters is whether the organizations' activities were undertaken because of the challenged law, not whether "they

are voluntarily incurred or not." *Id*. By way of analogy, when there is an outbreak of the flu, doctors will predictably order more flu vaccines, work longer hours, and educate the public about the danger. The additional work is certainly done willingly or "voluntarily" but it is not self-inflicted—it is caused by the outbreak. In our setting, *Havens* recognizes standing only for a "*consequent* drain on resources." 455 U.S. at 379 (emphasis added). Indiana's argument is really an objection to the type of causal chain on which *Havens* relied, or perhaps to its existence in this case. Even understood that way, the Organizations have shown that Act 442 will likely create more work for them. This is sufficient not only for causation but for the redressability element of standing, since without Act 442 there will be less drain on their resources.

## C

Indiana's final standing objection is broader. It accuses the Organizations of trying to transform abstract disagreement with its policy choices into an injury, where one would not otherwise exist. An abstract disagreement, of course, is not an Article III injury. "[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete [and particular] injury required by Art. III." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 (1976). "Indignation at violation of the law is not concrete because it does not impact the plaintiff personally; it is not particularized because it does not affect him in an 'individual way.'" *Carello v. Aurora Policemen Credit Union*, No. 18-2887, 2019 WL 3072152, at *3 (7th Cir. July 15, 2019). As the Ninth Circuit put it, an organization "cannot manufacture the injury by … simply choosing to spend money fixing a problem that

otherwise would not affect the organization at all." *La Aso-ciacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010); see also *OCA-Greater Houston*, 867 F.3d at 612; *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 285 (3d Cir. 2014) (rejecting organizational standing for an Af-rican-American parent group because "simply choosing to spend money fixing a problem that otherwise would not af-fect the organization at all" is not enough for standing). We have no quarrel with that general point, but it does not de-scribe this case. The Organizations here are Indiana organiza-tions that have worked for years on the problem of voter par-ticipation and are bracing for a real-world impact on their spe-cific core mission and lawful work.

We need not decide here whether all the injuries to which the Organizations point are enough to support standing; it is enough that some do. Indiana says that the Organizations "claim only an interest in both opposing [Act 442] and helping others contend with it." We have no problem ruling out standing for lobbying efforts in Indiana's legislature, but that is not the activity on which the Organizations are relying. In "helping others contend" with or prepare for Act 442, the Or-ganizations perform concrete work, voter-by-voter, polling place by polling place. Act 442 created the problem, and so causation exists. An injunction against these novel voter re-moval measures would redress the Organizations' injury. We thus affirm the district court's holding that the Organizations have shown enough to assert standing on behalf of them-selves.

### D

Because we conclude that the Organizations have standing to challenge Act 442 in their own right, we need not reach the issue of their standing to sue on behalf of their membership. That reticence should not be understood, however, as a hint that we would reject such standing. The Organizations may wish to develop this point as the litigation proceeds. The Supreme Court outlined the requirements that an association must meet in order to bring suit on behalf of its members in *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977). It held there that such standing exists "when: (a) [the organization's] members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343. It is notable that the second of those requirements calls for interests *germane* to the organization's purpose—a requirement that seems just as pertinent to a suit on behalf of the organization itself as it does to a suit on behalf of the members. But we can forgo further comment on representational standing in light of our conclusion on organizational standing.

### III

On the merits, Indiana challenges only the district court's conclusion that the Organizations have shown the necessary likelihood of success. When reviewing the grant of a preliminary injunction, we review the district court's findings of fact for clear error and its legal conclusions *de novo*. *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 269 (7th Cir. 2009).

A

Indiana is one of the many states that currently participate in the Crosscheck system administered by the Kansas Secretary of State. With Crosscheck, Indiana is able to send in its voter registration data and receive "matches" flagged in the Crosscheck database as potential duplicate registrants. Crosscheck uses software that compiles and compares voter registration data from participating states in an effort to identify duplicate records and thus double registrations. The Organizations contend that Crosscheck is deeply flawed. For example, pointing to expert reports, the Organizations assert that it has serious accuracy problems.[2]

Before digging into this argument, we stress that we are not evaluating the question whether Indiana may choose to participate in Crosscheck or any other program. That is the state's decision to make. Our concern is only with the way the state is using the information it receives, and in particular whether that use complies with the NVRA.

The record shows that under the regime in place *without* the changes effected by Act 442, when Indiana gets a match from Crosscheck—meaning that it is informed that Voter AB

---

[2] For example, a more general statistical study by plaintiff's expert showed that an unexpectedly large number of people may have both the same name and the same date of birth. See Brennan Center for Justice and Dr. Michael McDonald (George Mason University), *Analysis of the September 15, 2005 Voter Fraud Report Submitted to the New Jersey Attorney General* 8–9 (December 2005), https://www.brennancenter.org/sites/default/files/analysis/Analysis%20of%20the%209-15-05%20Voter%20Fraud%20Report.pdf.

is registered in both Indiana and another state, State X—it fol-
lows up by directly contacting Voter AB or checking to see if
the registrar already received a written request from Voter AB
to cancel her Indiana registration. If and when it takes effect,
Act 442 will change that system. Instead of prompting follow-
up directly with the voter, Act 442 specifies that a Crosscheck
match will trigger the following actions:

> (d) … Not later than thirty (30) days following the re-
> ceipt of information under this subsection indicating
> that a voter of Indiana may also be registered to vote
> in another state, the NVRA official shall provide the
> appropriate county voter registration office with the
> name of and any other information obtained under this
> subsection concerning that voter, if the first name, last
> name, and date of birth of the Indiana voter is identical
> to the first name, last name, and date of birth of the
> voter registered in the other state. The county voter
> registration office shall determine whether the individ-
> ual:
>
> > (1) identified in the report provided by the
> > NVRA official under this subsection is the same
> > individual who is a registered voter of the
> > county; and
> >
> > (2) registered to vote in another state on a date
> > following the date that voter registered in Indi-
> > ana.
>
> (e) If the county voter registration office determines
> that the voter is described by subsection (d), the county
> voter registration office *shall cancel the voter registration
> of that voter.*

2017 Ind. Legis. Serv. P.L. 74-2017 (Act 442) (emphasis added).
Act 442 thus does away with the process of contacting the
voter or confirming that the voter requested removal. Instead,
it requires the county election official to remove a voter from
the rolls immediately, based exclusively on the official's uni-
lateral assessment that the alleged "match" is accurate—that
is, that the person registered in State X is the same as the per-
son registered in Indiana, and that the State X registration is
more recent. Act 442 was amended the following year to add
a set of "confidence factors" that the responsible state official
must assess. (We have more to say about those factors in a
moment.) Once the official finishes the assessment, he must
send only those names that meet a certain confidence thresh-
old to the county election official to remove. IND. CODE § 3-7-
38.2-5. Indiana insists that this new process (both original and
as amended) complies with the NVRA, despite the fact that it
omits any direct contact with the voter whose name has been
flagged.

The state attempts to trivialize that omission, but a review
of the NVRA reveals that it is fatal. The NVRA requires states
to "conduct a general program that makes a reasonable effort
to remove the names" of voters who are ineligible because of
death or change in residence. 52 U.S.C. § 20507(a)(4). To pro-
tect the electorate, however, these state programs must follow
certain prescribed steps before removing any suspected ineli-
gible voter. The following restrictions are pertinent here:

- Except in cases of criminal convictions or
  mental incapacity, "the name of a registrant
  may not be removed from the official list of
  eligible voters except … *at the request of the*

*registrant* ... or as provided under [a permissible state list maintenance program]." *Id.* § 20507(a)(3) (emphasis added).

- "A State shall not remove the name of a registrant from the official list of eligible voters … on the ground that the registrant has changed residence *unless the registrant confirms in writing* that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; *or has failed to respond to a notice … and has not voted or appeared to vote [in the next two] general election[s].*" *Id.* § 20507(d) (emphasis added).

To summarize, this scheme forbids a state from removing a voter from that state's registration list unless: (1) it hears directly from the voter via a "request" or a "confirm[ation] in writing" that the voter is ineligible or does not wish to be registered; or (2) the state goes through the statutorily prescribed process of (a) notifying the voter, (b) giving the voter an opportunity to respond, and (c) then waiting *two* inactive election cycles before removing a suspected ineligible voter who never responds to the notice. Both of these avenues focus on direct contact with the voter. The accuracy or lack thereof of the state's information concerning the voter's change in residence makes no difference under the NVRA. The statute does not set an accuracy threshold; it relies instead on follow-up with the individual voter. The "confidence factors" to which we referred earlier, which were added the year after Act 442 was passed, thus do not help the state's argument. A look at those factors, which we set out in the margin, also reveals that

many may not exist for perfectly legitimate reasons, such as the confidentiality of Social Security numbers, the likelihood that a new state may not care about an Indiana driver's license, or the triviality of a middle name or last-name suffix.[3]

## B

Act 442 does away with the process of personal contact with the suspected ineligible voter and allows Indiana election officials to remove a person from the rolls based on Crosscheck *without direct notification of any kind*. On its face, this appears to be inconsistent with the NVRA's prohibition on removing voters without either hearing from them directly or going through the notice process. Indiana has two theories for how Act 442 nonetheless complies with the NVRA. Both

---

[3] The statute reads as follows:

(d) … The NVRA official shall provide the appropriate county voter registration office with the name of and any other information obtained under this subsection concerning that voter, if both of the following apply:

   (1) The first name, last name, and date of birth of the Indiana voter is identical to the first name, last name, and date of birth of the voter registered in the other state.

   (2) A comparison of the records indicates that there is a confidence factor that the records are for the same individual resulting from the accumulation of at least seventy-five (75) points based on the following criteria:

     (A) Full Social Security number: 40 points.

     (B) Last four (4) digits of Social Security number: 10 points.

     (C) Indiana driver's license or identification card number: 50 points.

     (D) Date of birth: 25 points.

     (E) Last Name: 15 points.

     (F) First Name: 15 points.

     (G) Middle Name: 5 points.

     (H) Suffix: 5 points.

     (I) Street Address 1: 10 points.

     (J) Zip Code (first five (5) digits): 5 points.

IND. CODE § 3-7-38.2-5.

theories take the position that *indirect* contact with the voter or the possession of third-party information is the equivalent of *direct* contact with the voter. Indiana's first argument is that the registration information received from another state counts as a "request" from the registrant to un-register under § 20507(a)(3)(A). The state's second suggestion is that Act 442's procedure is permissible under the NVRA because the new registration is a written confirmation that the registrant has changed residence, and that fact alone is enough to permit Indiana to remove the name under § 20507(d). A closer look at both arguments reveals them to be a stretch, at best.

The NVRA says that a state may remove the name of a registrant from its rolls if it takes that action "at the request of the registrant." § 20507(a)(3). Indiana contends the "registrant's act of registering to vote in another State must be understood as a written request to remove that person's name from the rolls in the previous State of residence." We evaluate that argument by turning first to the text of the statute. We read that text with the assumption that its words carry their "ordinary meaning." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009); see also ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69 (2012) ("Words are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense."). The ordinary meaning of "remov[al] … at the request of the registrant" is that *the registrant requests removal*. Drawing an inference from information provided by Crosscheck indicating that a voter has registered in another jurisdiction is neither a request for removal nor is it from the registrant, as required under the terms of § 20507(a)(3). It is only

an action that allows an inference that the voter is relinquishing her Indiana domicile, but the NVRA requires more than such an inference.

Indeed, the inference might be rebuttable—someone might move to Kansas from Indiana to take a new job, and upon arrival in Kansas immediately register to vote in Kansas. But if her personal circumstances change before Election Day—she flunks a probationary period on the job, a family member becomes sick, a better opportunity arises in Indiana—the person might decide to return to her former residence in Indiana. That person's Indiana registration, according to the NVRA, is still valid unless the person herself took steps to revoke it. Especially in states that have an early registration deadline, it may be perfectly rational for a voter to register in a new location before getting around to canceling the old Indiana registration, selling an Indiana house, or severing other formal connections with Indiana. Every year millions of Americans go off to college in August. Some drop out by November, for academic, financial, or other reasons, and land back on their parents' doorsteps. They will *vote* in only one place, even if they have open registrations in two. The only way to know whether voters want to cancel their registration is to ask them.

Registering to vote in another state is not the same as a request for removal from Indiana's voting rolls. Indiana relies on the criminalization of double voting to support its argument that registering to vote in a new jurisdiction *must* imply that the voter does not want to be registered in his old jurisdiction any more. In so arguing, Indiana equates double registration with double voting. But the two are quite different.

While double voting is surely illegal, having two open voter registrations is a different issue entirely. In the overwhelming majority of states, it is not illegal to be registered to vote in two places, see *Double Voting*, THE NATIONAL CONFERENCE OF STATE LEGISLATORS (Jan. 4, 2018), http://www.ncsl.org/reActrch/elections-and-campaigns/double-voting.aspx (compiling state statutes). Indiana makes it a misdemeanor recklessly to register or offer to register to vote more than once. IND. CODE § 3-14-2-4. But if that statute, following the normal presumption against extraterritoriality, operates only within Indiana, it too is of no help to the state.

Even if Indiana could convince us that a new registration is the equivalent of a "request" to cancel a voter's old registration, it is still not a request "of the registrant." § 20507(a)(3). The information passed along by Crosscheck is sparse. As it currently operates, a subscriber state such as Indiana does not receive a copy of the other state's registration. Thus, Indiana does not even know whether the (supposed) Indiana registrant has communicated anything to another governmental entity. It relies exclusively on Crosscheck's word that such a document exists. The only straightforward reading of the phrase "at the request *of the registrant*" is that the registrant herself makes the request to the state. *Id.* (emphasis added). We cannot twist that language to encompass indirect information from a third-party database.

This reading also makes sense in the context of the rest of the NVRA, see *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015), which emphasizes the state's duty to communicate—or at least attempt to communicate—directly with a voter before it removes that voter's name from the rolls. See § 20507(a)(3) (re-

moval allowed at the request of the voter); § 20507(b)(2) (removal allowed after registrant has failed to respond to personal notice and failed to appear in two elections); § 20507(c)(1) (removal allowed after the U.S. Postal Service's change of address information is used to identify persons who have moved and then compliance with the notice procedure in (d)); § 20507(d)(1) (removal allowed based on suspected address change only if voter confirms the address change in writing or fails to respond to a notice and does not vote in the next two elections).

Even if (counterfactually, on the present record) Crosscheck sent Indiana a copy of the new voter registration, prepared personally by the voter, there would be another problem: the NVRA emphasizes the state's duty diligently to reach out to its electorate. For present purposes, we may leave for another day the question whether a state is entitled to rely on documents passed through multiple hands. It is enough to say that at least when a state does not itself possess a copy of a communication from a suspected Indiana registrant, it does not have a "request of the registrant" sufficient by itself to permit immediate removal of that voter's name from the rolls.

Indiana counters that there is no "reliability" requirement in the statute. True enough. There's something even stronger: a requirement that the state must receive a direct request from "the registrant" before de-registering that person. Act 442's problem has nothing to do with the reliability of Crosscheck or Indiana's confidence factors. What does matter is that the system it chose flouts the NVRA's command that the state rely on the registrant herself.

Indiana's second argument—that the same notification from Crosscheck of a suspected matching registration in another state serves as a "confirm[ation] in writing" that the registrant has moved under § 20507(d)(1)(A)—is likely to fail for similar reasons. The statute states that "[a] State shall not remove the name of a registrant … unless *the registrant* confirms in writing that the registrant has changed residence." § 20507(d)(1)(A). To re-state the obvious, Crosscheck is not the resident, nor is it the resident's agent.

The NVRA acknowledges that states may suspect (with good reason) that a registrant is no longer eligible to vote because she has moved out of state. But more than that initial information is needed before the state may act on it. Once the state has that information, the NVRA *then* requires that the state either "confirm" the information *with the registrant* before removing the person from the rolls or attempt to provide personal notice. § 20507(d)(1)(A)–(B). The statute does not have a knowledge requirement; it has a confirmation requirement. A plain-meaning reading of the NVRA dictates that the states need to "confirm" something—in this instance the initial information they received. It stretches the meaning of "confirm" past its limits to ignore its key feature of corroborating or verifying a prior piece knowledge.

Moreover, Indiana's reading of "confirm" defies the structural logic of the statute by allowing a state to bypass the notice procedure. As the Supreme Court recently emphasized, the NVRA's procedures for removal must be followed "to the letter." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018). The NVRA offers a few examples of how states can comply, and none allows an initial piece of information to serve double-duty as initial notice and as confirmation. Most

notably, in section 20507(c)(1)(B), the NVRA specifies that a state may satisfy the NVRA's requirements by relying on "change-of-address information supplied by the Postal Service … to identify registrants whose addresses may have changed" and then "us[ing] the notice procedure." Indiana is free to launch that process using Crosscheck information or other information from a third party. But it cannot then skip past the requirement that it confirm the move directly with the voter or use the notice procedure prescribed by statute.

Not only does Indiana's reading ignore the common-sense interpretation of the phrase "the registrant confirms," but also, by allowing an initial piece of information suggesting a change in residency to perform double-duty as confirmation of the change, the state would render the confirmation requirement and the alternative notice provisions "insignificant, if not wholly superfluous." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). We are "reluctant to treat statutory terms as surplusage in any setting… [but] are especially unwilling to do so when the term occupies so pivotal a place in the statutory scheme." *Id.* (quoting *Babbitt v. Sweet Home Chapter, Communities for Great Ore.*, 515 U.S. 687, 698 (1995) (quotation marks omitted)). We cannot, as Indiana would have us, "distort[] texts adopted by the people's elected representatives" to suit the state's purposes. A. SCALIA & B. GARNER, *supra* at 3.

Because we affirm the district court's holding that the Organizations are likely to succeed on the merits of their challenge to Act 442 as inconsistent with the NVRA, we do not reach the Organizations' alternative arguments that Act 442 violates the NVRA's requirement that laws be uniform, non-discriminatory, and comply with the Voting Rights Act under section 20507(b)(1).

Nos. 18-2491 & 18-2492                                      35

## IV

   We live in a representative democracy, in which the voice of the people is essential to the legitimacy of our governing institutions. Democracy starts with each voter's act of showing up at the polls to express his or her preferences. The integrity of the voting process is critical, and one measure to protect that integrity is the voter-registration process. A name on a voter roll in Indiana is there only because a voter took the trouble to put it there. Laws such as the NVRA ensure that the states do not undo that work without good reason. "[T]he right … to vote is a fundamental right," 52 U.S.C. § 20501(a)(1). The NVRA is designed to ensure that the competing interest in preventing abuse does not wind up disenfranchising American voters. On the preliminary injunction record before us, we are satisfied that the plaintiff Organizations have standing to sue, and that they put enough in the record to show a likelihood of success on the merits.

   We therefore AFFIRM the district court's grant of preliminary injunctive relief in each of these cases.

BRENNAN, *Circuit Judge*, concurring. I agree with the conclusions in the majority's comprehensive opinion, both as to the plaintiffs' standing and their likelihood of success on the merits. I write separately only to express my understanding of what an organizational plaintiff must demonstrate to establish standing to sue on its own behalf under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).

People vote, not organizations, so none of the plaintiffs before us may cast a vote in any election. *Cf. Gill v. Whitford*, 138 S. Ct. 1916, 1920 (2018) (noting that voting rights are "individual and personal in nature"). As a general rule, litigants may sue only on their own rights and cannot base "claims on the legal rights or interests of third parties." *Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 475 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Nonprofit organizations and public interest groups cannot bring suit to vindicate their abstract policy preferences, no matter how worthy the cause or intense their interest. *Sierra Club v. Morton*, 405 U.S. 727, 736 (1972) (nonprofit's "longstanding concern with and expertise in [environmental] matters" did not remove its burden to establish individualized injury). So, the organizational standing of these plaintiffs must rest on something other than the removal of voters from Indiana's rolls.

Article III's standing requirement serves a functional role in maintaining our separation-of-powers system. *See* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK UNIV. L. REV. 881, 894–97 (1983). It precludes federal courts from becoming alternative battlegrounds for policy disputes properly resolved in the legislative and executive branches. *Spokeo v. Robins*, 136 S. Ct.

1540, 1547 (2016) (noting that Article III standing "serves to prevent the judicial process from being used to usurp the powers of the political branches and confines the federal courts to a properly judicial role") (internal quotation marks and citations omitted). Rigorous policing of plaintiffs' standing is critical to our system of democracy. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408–09 (2013) ("Relaxation of standing requirements is directly related to the expansion of judicial power.") (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)). As the majority opinion aptly notes, *supra* at 2–3, the Constitution leaves most decisions regarding voting procedures to the States, even with respect to federal elections. In *Havens Realty*, the Supreme Court applied basic Article III standing principles to a nonprofit organization seeking to sue in its own name.[†] The Court distinguished organizational plaintiffs who show a "concrete and demonstrable injury to the organization's activities" from those simply alleging "a setback to the organization's abstract social interests." 455 U.S. at 379. The former have standing, the latter do not.  The Supreme Court recognized that an organizational plaintiff "perceptibly impaired" in its ability to provide services has sustained a concrete injury. *Id.*

The test for organizational standing under *Havens Realty* is the same as that for any other plaintiff: Has the plaintiff demonstrated a concrete, particularized injury to its own interests, or is it complaining of a generalized grievance shared broadly with other members of the public? *See New York Civil*

---

[†] The case also involved individual plaintiffs and an organizational plaintiff's alleged associational standing, but the focus here is just on the opinion's discussion of the organizational plaintiff's standing to sue in its own right.

*Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) ("Under this theory of 'organizational' standing, the organization is just another person—albeit a legal person—seeking to vindicate a right. To qualify, the organization itself must meet the same standing test that applies to individuals.") (internal quotations and citations omitted). Roadblocks to an organization's abstract advocacy or educational objectives are insufficient to gain entrance into federal court. *See, e.g., Keep Chicago Livable v. City of Chicago*, 913 F.3d 618, 625 (7th Cir. 2019). But if a defendant's actions compromise an organization's day-to-day operations, or force it to divert resources to address new issues caused by the defendant's actions, an Article III injury exists. *See, e.g., Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd* 553 U.S. 181 (2008).

As the majority opinion takes care to thoroughly show, the plaintiffs' evidence meets their burden at the preliminary injunction stage. As actual harm for Article III purposes, some of the proof offered by these plaintiffs is rather thin gruel, like uploading a poster to a website and an increased volume in incoming telephone calls. But each organization submitted sufficiently specific testimony from senior leadership detailing their organization's work, and then connected the imminent impact of Act 442 to their organization's operations. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (standing can be shown through threatened harms from imminent enforcement of a law). The totality of each plaintiffs' evidence established their organization's concrete, particularized injury, so their proof met Article III's requirements.

In summary, a nonprofit's intense interest in voting rights does not automatically give it standing to challenge all voting

laws and procedures. *People Org. for Welfare and Employ't Rights v. Thompson*, 727 F.2d 167, 171 (7th Cir. 1984) ("All of us want government to do things to or for other people: … But desire does not create standing."). But the plaintiffs in this case have offered sufficient and specific evidence at the preliminary injunction stage as to how Indiana's new law will create imminent harm to them by directly and negatively impacting their operations and forcing them to divert their limited resources. That is enough according to the Supreme Court in *Havens Realty*. 455 U.S. at 379. Because I agree with the majority's conclusion regarding these plaintiffs' organizational standing, I express no views on the parties' alternative representational or associational standing arguments.