# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

August 10, 2021

To:   Roger A. G. Sharpe
      UNITED STATES DISTRICT COURT
      Southern District of Indiana
      United States Courthouse
      Indianapolis, IN 46204-0000

| | |
|---|---|
| No. 20-2815 | LEAGUE OF WOMEN VOTERS OF INDIANA, INCORPORATED, et al.,<br>          Plaintiffs - Appellees<br><br>v.<br><br>HOLLI SULLIVAN, et al.,<br>          Defendants - Appellants |
| No. 20-2816 | COMMON CAUSE INDIANA,<br>          Plaintiff - Appellee<br><br>v.<br><br>HOLLI SULLIVAN, in her official capacity as Secretary of State of Indiana, et al.,<br>          Defendant - Appellants |

| **Originating Case Information:** |
|---|
| District Court No: 1:17-cv-02897-TWP-MPB<br>Southern District of Indiana, Indianapolis Division<br>District Judge Tanya Walton Pratt |

| **Originating Case Information:** |
|---|
| District Court No: 1:17-cv-03936-TWP-MPB<br>Southern District of Indiana, Indianapolis Division |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A

certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:                           No record to be returned

form name: **c7_Mandate**     (form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**FINAL JUDGMENT**

July 19, 2021

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

*Before*

DIANE P. WOOD, *Circuit Judge*
MICHAEL B. BRENNAN, *Circuit Judge*
AMY J. ST. EVE, *Circuit Judge*

|  |  |
|---|---|
| Nos. 20-2815 & 20-2816 | LEAGUE OF WOMEN VOTERS OF INDIANA, INCORPORATED, *et al.*,<br><br>                    Plaintiffs - Appellees<br><br>v.<br><br>HOLLI SULLIVAN, in her official capacity of State of Indiana, *et al.*,<br><br>                    Defendants - Appellants |

| Originating Case Information: |
|---|
| District Court Nos: 1:17-cv-02897-TWP-MPB & 1:17-cv-03936-TWP-MPB<br>Southern District of Indiana, Indianapolis Division<br>District Judge Tanya Walton Pratt |

We **AFFIRM** the district court's grant of summary judgment and we **AFFIRM IN PART** and **VACATE IN PART** the district court's permanent injunction. The case is **REMANDED** for further proceedings consistent with the opinion. The above is in accordance with the decision of this court entered on this date. Each side to bear its own costs in this matter.

form name: **c7_FinalJudgment**    (form ID: **132**)



A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 20-2815 & 20-2816

LEAGUE OF WOMEN VOTERS OF INDIANA, INC., *et al.*,

*Plaintiffs-Appellees*,

*v.*

HOLLI SULLIVAN, in her official capacity as Secretary of State of Indiana, *et al.*,

*Defendants-Appellants*.

_____

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
Nos. 1:17-cv-02897 & 1:17-cv-03936 — **Tanya Walton Pratt**, *Chief Judge*.

_____

ARGUED APRIL 22, 2021 — DECIDED JULY 19, 2021

_____

Before WOOD, BRENNAN, and ST. EVE, *Circuit Judges*.

WOOD, *Circuit Judge*. In this case, we return to the question whether Indiana's procedures for maintaining its official list of registered voters comply with federal law. On its first trip here, Indiana was defending Act 442 (as its voter-registration law at the time was called). See *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019) ("*Common Cause I*"). We concluded that Act 442 was preempted by the National Voter

Registration Act (NVRA), 52 U.S.C. §§ 20501–20511, because it allowed the state to remove a registered voter from its official list without following the procedures mandated by the NVRA. See 52 U.S.C. § 20507(d). Now Indiana is here again with a new law, Act 334. Indiana contends that Act 334 eliminates the provisions we found problematic in Act 442. And to a degree, this is true. But what Act 334 took with the left hand, it gave away with the right, and the net result is continued inconsistency with the NVRA. Therefore, we find that portions of it, too, are preempted by federal law.

## I

Our story begins in 2017, with the passage of Senate Enrolled Act 442 (Act 442). Act 442 adopted an "aggressive new strategy" for cleansing Indiana's voter rolls of people who the state suspected were no longer qualified to vote there. *Common Cause I*, 937 F.3d at 946. Act 442 allowed Indiana election officials to remove a voter from the state's voter rolls automatically (meaning without directly contacting the person in question) based on information acquired through a third-party database known as "Crosscheck." Crosscheck provided the Indiana Election Division—the central election authority in the state—with the voter lists of multiple states. Once the Election Division received this information, it applied certain "confidence factors" to the data, assigning points when certain data fields relating to an out-of-state voter and Indiana voter matched. When a voter's records exceeded a specified point threshold, the Election Division forwarded the voter's Crosscheck data to county election officials. (In Indiana, county election officials maintain the official voter rolls. See Ind. Code § 3-7-38.2-1 to -2.) Act 442 then required county officials to determine whether (1) the Indiana voter and the out-

of-state voter were the same person, and (2) the matching registration in the second state postdated the registration in Indiana. See Ind. Code § 3-7-38.2-5(d) (2018). If these two criteria were met, Act 442 mandated that county officials cancel the Indiana registration of the voter, without further notice or opportunity for the voter to contest her removal. *Id.* § 3-7-38.2-5(e).

Act 442 was challenged in two separate lawsuits by three organizations: the Indiana National Association for the Advancement of Colored People (NAACP), the League of Women Voters of Indiana (the League), and Common Cause Indiana (CCI) (collectively, the Organizations). They sued the Secretary of State (initially Connie Lawson, now Holli Sullivan) and the two Co-Directors of the Indiana Election Division (J. Bradley King and Angela Nussmeyer) seeking to enjoin enforcement of the Act. (Because the defendants are being sued in their official capacities only, we refer to them collectively as Indiana.) In both cases, the Organizations have maintained that Act 442 violates the NVRA because it allows Indiana to remove registered voters without following the removal procedures specified by the federal statute.

The district court agreed with the Organizations and preliminarily enjoined enforcement of Act 442. We consolidated the two cases on appeal and affirmed. See *Common Cause I*, 937 F.3d 944. We emphasized that we were not criticizing Indiana's decision to participate in Crosscheck, or for that matter any other program that furnishes out-of-state voter-registration information. Rather, the problem was with how the state chose to use the data it acquired. Act 442 allowed Indiana to remove voters from its rolls without either (1) hearing directly from that voter that he or she wished to

be removed, or (2) providing notice to the voter that the voter would be removed from the rolls if he or she did not respond and failed to vote in the next two federal general elections. Taken together, these provisions brought the Act into direct conflict with the removal procedures mandated by the NVRA. *Id.* at 959; see 52 U.S.C. § 20507(a), (d). We concluded that the Organizations were likely to succeed on the merits of their claim, and so we affirmed the district court's preliminary injunction.

Shortly after our decision in *Common Cause I*, Indiana repealed Act 442 and replaced it with Senate Enrolled Act 334 (Act 334). Act 334 ended Indiana's participation in Crosscheck, but the change was largely cosmetic. Act 334 replaces Crosscheck with a new system called the Indiana Data Enhancement Association (IDEA). See Ind. Code §§ 3-7-38.2-5.1, -5.5. Despite the different window dressing, IDEA is functionally identical to Crosscheck: under the program, Indiana collects voter-registration information from other states and then uses that information to identify potential duplicate registrations. See *Id.* §§ 3-7-38.2-5.5(a)–(b), -7.5.

Once Indiana receives another state's voter information, Act 334 directs Indiana state officials to compare the information obtained to the list of registered voters in Indiana and identify potential matches who meet a certain "confidence factor" threshold (based on matching data such as name, social security number, and date of birth, where available). Potential matches are relayed to county election officials for further review. See Ind. Code § 3-7-38.2-5.5(b)(5)(B), (c). The Act makes county officials ultimately responsible for deciding whether to remove or keep a name on the state's voter rolls. *Id.* § 3-7-38.2-5.5(d).

Act 334 deletes Act 442's requirement that county officials automatically remove an Indiana voter from the rolls based solely on county election officials' identification of a match using out-of-state voter-registration information. Instead, subsection 5.5(d) of Act 334 instructs county officials to make three determinations:

> (1) whether the presumptive match in another state "is the same individual who is a registered voter of the county";

> (2) whether the registration in the second state occurred after the presumptively matching Indiana registration; and

> (3) whether the voter in question "authorized the cancellation of any previous registration" when the voter registered in the second state.

*Id.* § 3-7-38.2-5.5(d)(1)–(3). The problem lies in the third requirement: what exactly does it take for the voter to provide the necessary authorization? In a handful of states, the voter-registration form includes a spot where the new registrant is invited expressly to authorize the cancellation of any prior registration she may have. See, *e.g.*, Michigan Voter Registration Application, https://www.michigan.gov/documents/ MIVoter Registration_97046_7.pdf (requiring the voter to "authorize the cancellation of any previous registration"). (From the parties, we understand that Indiana and nine other states—Delaware, Hawaii, Michigan, New Mexico, North Carolina, South Dakota, Vermont, Virginia, and Wyoming— engage in such a practice.) The other 40 states and additional jurisdictions do not offer such an option.

If county officials determine that all three criteria under subsection (d) are satisfied, then Act 334 directs that "the county voter registration office shall cancel the voter registration of that voter." *Id.* § 3-7-38.2-5.5(e). If only criteria (1) and (2) are met (*i.e.*, the identified voter has not authorized the cancellation of any previous registration), then the Act instructs county officials to begin the notice-and-waiting procedures prescribed by the NVRA. *Id.*; see also *id.* § 3-7-38.2-13 to -14 (setting forth the notice, waiting, and removal requirements accompanying a change of address under Indiana law).

If that were all we had, then one might wonder where the problem lies. Subsections 5.5(d) and (e) mirror the state's voter-removal procedures as they existed before Act 442 came into effect in 2017. See Ind. Code § 3-7-38.2-5(d)–(e) (2016). Act 334, however, did not simply restore the *status quo ante*. Instead, it added a new subsection (f) that was not previously an element of Indiana's voter-removal law. It is this subsection—particularly subpart (2)—that is the focus of the Organizations' present challenge. It provides:

(f) The county voter registration office may rely on written information provided either directly by a voter registration office in another state or forwarded from the election division from the office in the other state as follows:

(1) If this information is provided directly from the other state to the Indiana county voter registration official, the out-of-state voter registration official must provide a copy of the voter's signed voter registration application which indicates the individual authorizes cancellation of the individual's previous registration.

> (2) If the election division forwards written notice from another state to an Indiana county voter registration official, the county should consider this notice as confirmation that the individual is registered in another jurisdiction and has requested cancellation of the Indiana registration. A copy of the actual voter signature is not required to be provided to the county for the voter's status to be cancelled if the written notice is forwarded by the election division.

Ind. Code § 3-7-38.2-5.5(f) (2020).

By the time the Indiana legislature passed Act 334, the litigation concerning Act 442 had proceeded to the permanent injunction stage. After Act 334 went into effect, the Organizations moved for summary judgment and asked the district court permanently to enjoin its enforcement, largely because of the addition of subsection (f)(2). Indiana responded that Act 442's repeal rendered this litigation moot and required the Organizations to bring a new lawsuit to challenge Act 334.

The district court ultimately determined that Act 334 could be challenged in the current case, because it did not eliminate the problematic features of Act 442, especially the impermissible voter-cancellation procedures. The court then granted summary judgment in favor of the Organizations. It explained that "[Act] 334 commits the same error as [Act] 442" in that it "allows for cancellation of a voter's registration without any direct contact with the registered voter." Specifically, subsection (f)(2) contravenes the NVRA because it directs the county to *presume* that a voter who registers (or is thought to have registered) in another state has authorized cancellation of that voter's Indiana registration, even if neither Indiana nor

the new state has yet received word from the voter. The court then entered the following permanent injunction:

> [Defendants are prohibited] from implementing [Ind. Code § 3-7-38.2-]5.5(d)–(f) and from otherwise removing any Indiana registrant from the list of eligible voters because of a change in residence absent: (1) a request or confirmation in writing directly from the voter that the voter is ineligible or does not wish to be registered; or (2) the NVRA-prescribed process of (a) notifying the voter, (b) giving the voter an opportunity to respond, and then (c) waiting two inactive federal election cycles.

Indiana has now brought its challenges to both orders to this court.

## II

On appeal, Indiana has abandoned its contention that Act 442's repeal rendered this case moot. Nonetheless, because mootness is jurisdictional, see *Powell v. McCormack*, 395 U.S. 486, 496 n.7 (1969), we briefly pause to address it.

A case is moot if the "issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* at 496. Mootness is a common concern when injunctive relief is sought in connection with a government policy, since a change in policy during the course of litigation may accord the plaintiffs full relief or deprive them of a legally cognizable interest. See *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854, 864 (7th Cir. 2013). But a change in policy does not automatically moot a case. For instance, "[w]hen a challenged policy is repealed or amended mid-lawsuit … [a] case is not moot if a substantially similar

policy has been instituted or is likely to be instituted." *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 287 (7th Cir. 2014). In other words, if the policy change does not correct the asserted problem, the case is not moot and the litigation may proceed. *Id.* The critical question we must answer is thus whether "the changes are so substantial as to make it unwise" for courts to consider the new policy in the same case. *Id.* at 288.

We agree with the district court that the repeal of Act 442 and its replacement with Act 334 did not render this case moot. The crux of the Organizations' challenge to Act 442 was that Indiana's voter-list maintenance law violates the NVRA by permitting the state to cancel voter registrations without first receiving a request from a registrant or following the NVRA's notice-and-waiting procedures. The Organizations maintain that Act 334, through the operation of subsection (f)(2), similarly violates the NVRA by allowing Indiana to remove voters from its rolls automatically, without any direct contact with the voter. We therefore agree with the district court that the "gravamen" of the Organizations' challenge is unchanged, and that the same case or controversy persists between the parties. With our jurisdiction secure, we now may consider the heart of Indiana's appeal.

## III

Indiana offers three reasons why the district court's injunction should not stand. First, it maintains that the NVRA does not preempt Act 334. Although the state admits that it is possible to read the Act as conflicting with federal law, it argues that Act 334 is ambiguous and so we can and should adopt a reading of the Act that avoids preemption. Second, Indiana asserts that even if the proper reading of Act 334

conflicts with the NVRA, the Organizations' challenge fails because of the procedural posture of the case: according to Indiana, the Organizations have failed to show that Act 334 has no valid applications, which (Indiana claims) they were required to prove in a pre-enforcement challenge such as this. Finally, Indiana argues in the alternative that the district court's injunction was overly broad and impermissibly vague.

We are not persuaded by Indiana's first two points, but we agree with it on the third. The district court's injunction swept too broadly insofar as it enjoined subsections (d) and (e) in addition to subsection (f). We also agree with the state that the court's orders were vague in that they failed to clarify whether Indiana may automatically remove a voter if the state receives a signed voter-registration form from a second state in which the voter personally and explicitly authorized the cancellation of her Indiana registration. Accordingly, we affirm the district court's grant of summary judgment to the Organizations, and we affirm in part and vacate in part its permanent injunction.

## A

The parties' central dispute concerns whether section 3-7-38.2-5.5(f)(2) of Act 334 creates a clear conflict with the NVRA or is instead ambiguous and susceptible to a saving construction. The district court determined that the NVRA preempted Act 334 and granted summary judgment to the Organizations. We review that decision *de novo*, reading the evidence in the light most favorable to Indiana and drawing all reasonable inferences in its favor. See *Vaughn v. Walthall*, 968 F.3d 814, 818 (7th Cir. 2020).

One of Congress's stated purposes in passing the NVRA was "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501. To that end, Congress included multiple express preemption clauses in the statute, one of which provides:

> In the administration of voter registration for elections for Federal office, each State *shall … provide* that the name of a registrant may not be removed from the official list of eligible voters *except … at the request of the registrant*; … as provided by State law, by reason of criminal conviction or mental incapacity; or … as provided under … a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of … the death of the registrant; or … a *change in the residence* of the registrant … .

*Id.* § 20507(a)(3)–(4) (emphasis added).

This case primarily concerns the NVRA's procedures for removing a registered voter where it appears that the registered voter has moved.[1] Under those circumstances, the NVRA spells out what must be done:

---

[1] As we stressed in *Common Cause I*, this case concerns Indiana's procedures for dealing with double registration, which the vast majority of states do not make unlawful. See 937 F.3d at 960. Double voting, of course, is widely criminalized. See generally *Double Voting*, Nat'l Conference St. Legislatures (June 16, 2021), https://www.ncsl.org/research/elections-and-campaigns/double-voting.aspx. Federal law makes it a crime to "vot[e] more than once" in a federal election, and that crime is punishable by up to five years in prison. 52 U.S.C. § 10307(e). To similar effect, 49 states and Washington, D.C., explicitly prohibit voting twice in the same election in some form. See, *e.g.*, 10 ILCS 5/29-5 ("Any person who, having

> [a] State shall not remove the name of a registrant from
> the official list of eligible voters … unless the registrant
> (A) confirms in writing that the registrant has changed
> residence to a place outside the registrar's jurisdiction
> in which the registrant is registered; or (B)(i) has failed
> to respond to a notice … ; and (ii) has not voted or ap-
> peared to vote … in [two consecutive federal election
> cycles].

*Id.* § 20507(d)(1). This is clear enough: it says that a state may
not remove a voter from its voter rolls without either (1) re-
ceiving a direct communication from the voter that she wishes
to be removed or (2) going through the NVRA-prescribed
process of (a) notifying the voter, (b) giving her an oppor-
tunity to respond, and (c) then waiting two inactive election
cycles before removing her. See *Common Cause I*, 937 F.3d at
959. Any state law that fails to follow that prescription cannot
stand.

　　In cases involving a clash between a federal law that ad-
dresses a traditional area of state regulation and a competing

---

voted once, knowingly during any election where the ballot … lists any of
the same candidates and issues … (a) files an application to vote in the
same or another polling place, or (b) accepts a ballot or enters a voting
machine … shall be guilty of a Class 3 felony."); Neb. Rev. Stat. § 293.780
(making it a felony to "vote[] more than once at the same election"); Va.
Code Ann. § 24.2-1004 ("Any person who intentionally (i) votes more than
once in the same election, whether those votes are cast in Virginia or in
Virginia and any other state or territory of the United States … is guilty of
a Class 6 felony."). Oddly enough, Indiana seems to be the only state
whose laws do not explicitly mention double voting; the state does, how-
ever, make it a class D felony knowingly to "appl[y] for or receive[] a ballot
in a precinct other than that precinct in which the person is entitled to
vote." See Ind. Code § 3-14-2-16.

state law, the Supreme Court presumes no preemption unless there is evidence of a "clear and manifest purpose" by Congress to do so. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). But voting cases are different: no such presumption applies to preemption cases involving the NVRA. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 (2013). That is because Congress's authority for the NVRA is rooted in the Constitution itself, whose Elections Clause expressly "empowers Congress to 'make or alter' state election regulations." *Id.* (quoting U.S. Const. art. I, § 4, cl. 1).

With this in mind, we turn to Act 334. In construing this state law, we are guided by the principles of statutory construction that the Indiana Supreme Court follows. Like the U.S. Supreme Court, the state supreme court gives primacy to the text of the statute. As it explained in *D.P. v. State,* 151 N.E.3d 1210 (Ind. 2020), "[i]n construing statutes, our primary goal is to determine the legislature's intent. But to ascertain that intent, we must first look to the statutes' language. If the language is clear and unambiguous, we give effect to its plain and ordinary meaning and cannot resort to judicial construction." *Id.* at 1216 (citations omitted). To similar effect, the court stated that "[w]e start with the plain language of the statute, giving its words their ordinary meaning and considering the structure of the statute as a whole. No word or part of the statute should be rendered meaningless if it can be reconciled with the rest of the statute." *Ind. Alcohol & Tobacco Comm'n v. Spirited Sales, LLC,* 79 N.E.3d 371, 376 (Ind. 2017) (internal quotation omitted). And, of importance here, the state justices have warned that "[c]ourts may not engraft new words onto a statute or add restrictions where none exist." *Kitchell v. Franklin*, 997 N.E.2d 1020, 1026 (Ind. 2013) (internal quotation omitted).

At first glance, Act 334 appears to be consistent with the voter-removal procedures of the NVRA. Sections 3-7-38.2-5.5(d) and (e) provide that county election officials may remove a voter from the rolls based on IDEA data only if officials determine that (1) the person identified in the report is the same one who is a registered voter of the county, (2) that person registered to vote in the second state after she registered to vote in Indiana, and (3) that person authorized the cancellation of her Indiana registration when she registered in the second state. If county officials are able to confirm only (1) and (2)—but not that the person authorized the cancellation of her Indiana registration—then *subsection (e)* does not permit those officials to remove the voter. Instead, it directs them to send an address-confirmation notice to the voter. See Ind. Code § 3-7-38.2-5.5(e).

Had the Indiana legislature stopped there, this would be a different case. (As we noted earlier, subsections (d) and (e) of Act 334 were components of Indiana's voter-registration law before the passage of Act 442.) But the legislature instead added a new provision, subsection (f), when it passed Act 334. As we indicated earlier, that addition is the focus of the Organizations' lawsuits.

Subsection (f) begins innocently enough. It permits county election officials to rely on two types of information in reaching a decision concerning a voter's registration under subsections (d) and (e): "written information provided either [1] directly by a voter registration office in another state or [2] forwarded from the [Indiana] election division from the office in the other state." Ind. Code § 3-7-38.2-5.5(f). Subsection (f)(1) specifies that if "this information" is provided to an Indiana county official directly from the other state, then the other

state "must provide a copy of the voter's signed voter registration application which indicates the individual authorizes cancellation of the individual's previous registration." (This requirement in practice can refer only to the nine states other than Indiana that include such an authorization as part of their registration form.)

In stark contrast to subsection (f)(1), subsection (f)(2) provides that if the Indiana Election Division "forwards written notice from another state" to county officials, then "the county should consider this notice as confirmation that the individual is registered in another jurisdiction and has requested cancellation of the Indiana registration." What's more, "[a] copy of the actual voter signature is not required to be provided to the county for the voter's status to be canceled if the written notice is forwarded by the election division." *Id.* § 3-7-38.2-5.5(f)(2).

The upshot of subsection (f)(2)'s language is this: any time a county election official receives "written notice" from Indiana election officials, county officials must *presume* for purposes of subsection (d)(3) that the voter has authorized the cancellation of his Indiana registration, *even if Indiana does not possess proof that the voter himself ever submitted such an authorization*. This presumption has critical implications for Act 334's compatibility with the NVRA. Recall that subsection (d) requires county officials to make three determinations. Subsection (e) then directs county officials immediately to cancel a voter's registration if all three criteria are met. But if county officials cannot confirm the third element—*i.e.*, that the voter herself authorized her Indiana registration to be cancelled—then county officials may not immediately cancel the voter's registration and instead must initiate the NVRA's notice-and-

waiting procedures. So far, so good. But then subsection (f)(2) sidesteps subsection (e)'s careful distinctions any time county officials have "written notice" forwarded to them: they *must* treat subsection (d)(3) as fulfilled, without any further inquiry, and then *must* cancel a voter's registration if there appears to be a duplicate registration and the non-Indiana registration postdated Indiana's registration. If this new scheme sounds familiar, that's because it is the same as the procedure found in Act 442 that violated the NVRA. See *Common Cause I*, 937 F.3d at 958. Just like Act 442, Act 334 impermissibly allows Indiana to cancel a voter's registration without either direct communication from the voter or compliance with the NVRA's notice-and-waiting procedures.

Indiana acknowledges that the subsection *could* be read to permit a county to remove an individual from its voter rolls even if Indiana does not possess a request from the registrant to cancel her registration. It urges, however, that subsection (f)(2) is ambiguous. Because of this ambiguity, Indiana says, it is possible for us to adopt a saving construction by reading into the statute a requirement that subsection (f)(2) applies only if Indiana has a copy of the authorization of cancellation somewhere on file. Since, in such a situation, Indiana would be in possession of a direct communication from the voter authorizing her removal from the rolls, any automatic removals that followed from subsection (f)(2) would occur in compliance with section 20507(a)(3)(A) of the NVRA. Indiana tries to explain away the last sentence of subsection (f)(2), which specifies that the county need *not* have a copy of the voter's signed voter registration application, by saying that it merely creates a small administrative efficiency by obviating the need for Indiana election officials to send along additional documents to county officials. Finally, Indiana attempts to justify

its "saving construction" on the ground that the term "written notice," which is not defined in Act 334, is ambiguous. It postulates that "written notice" may refer only to the subset of situations in which Indiana forwards a registered voter's name to county officials upon receiving an authorization-of-cancellation form.

The state's position, however, cannot be reconciled with the principles of statutory construction that its own supreme court has authoritatively established. If there is no ambiguity—and we find none—then *D.P.* instructs that we must confine ourselves to the statutory language and context. Moreover, *Kitchell* tells us that courts may neither engraft new words onto a statute nor "add restrictions where none exist." 997 N.E.2d at 1026. The plain fact is that the state legislature did not limit subsection (f)(2) to instances in which Indiana has a copy of the authorization of cancellation on file. Nor does the statute authorize the state to take shortcuts by failing to send along proof of the voter's authorization to the responsible county officials. It is not our job to draft a better law for Indiana. See *Sherman v. Cmty. Consol. Sch. Dist. 21*, 980 F.2d 437, 442 (7th Cir. 1992) ("We cannot rewrite a [state] law in order to 'save' it … ."); *K-S Pharmacies, Inc. v. Am. Home Prods. Corp.*, 962 F.2d 728, 730 (7th Cir. 1992) ("[A] federal court may not slice and dice a state law to 'save' it … [or] attribute to the state a law we could have written to avoid the problem.").

Indiana's position also fails to take into account the statutory context in which subsection (f) is embedded; the surrounding provisions of Act 334 erase any doubt about what is meant by the term "written notice." The term "written notice" is synonymous with the "presumptive matches" that the

Election Division forwards to counties under the IDEA program, and we find that its meaning necessarily *excludes* "a copy of the voter's signed [out-of-state] voter registration application which indicates the individual authorizes cancellation of the individual's previous registration." Ind. Code § 3-7-38.2-5.5(f)(1).

Several aspects of Act 334 lead us to this conclusion. The first is the text and structure of subsection (f) as a whole. As noted earlier, the introductory clause of subsection (f) refers to two types of information that county officials can rely on: (1) "written information" that is provided "directly by a voter registration office in another state" or (2) "written information" that is "forwarded from the [Indiana] election division from the office in the other state." *Id.* § 3-7-38.2-5.5(f). Subsection (f)(1) expands on the requirements related to the first category of "written information," and explains that anytime "*this* information" is provided to county officials, then the out-of-state election officials "must provide a copy of the voter's signed voter-registration application which … authorizes cancellation of the individual's previous registration." *Id.* § 3-7-38.2-5.5(f)(1) (emphasis added). This phrasing indicates that the authorization-of-cancellation notice is not included in the definition of "written information": it is in addition to—a requirement separate and apart from—the "written information" that non-Indiana officials provide.

Indiana reads (f)(1) differently; in its view, that subsection defines "written information" to *include* authorization-of-cancellation notices. We think not: information can come in many ways (oral, on a piece of paper, email, text), while an application to authorize cancellation of registration is a more precise phrase. Subsection (f)(1) is not worded as a definition:

it does not say, for instance, that if out-of-state officials provide written information directly to county officials, then "the written information must include an authorization-of-cancellation form." Rather, the clause sets forth a condition under which the "written information" provided by another state must be supplemented with something more concrete: an authorization-of-cancellation form.

We cannot read a silent requirement into subsection (f)(2) that would require states to provide signed authorization-of-cancellation forms to the Election Division, because the subsection contemplates only that other states will provide "written information" to the Election Division, and the latter will then pass along that information to the relevant county. And the text of subsection (f)(2) confirms that the term "written information" does not include authorization of cancellation notices. The statute says instead that any time a state (other than Indiana) provides "written notice" directly to the Election Division, and the Election Division then forwards that notice to the county, "a copy of the actual voter signature is *not* required to be provided to the county for the voter's status to be cancelled." (Emphasis added.) In other words, this second category of "written information"—"written notice"—*excludes* authorization-of-cancellation forms.

Now wait just a minute!, says Indiana: there must be some significance in the fact that subsection (f)(2) uses the term "written *notice*," whereas subsection (f)(1) refers to "this *information*" (meaning the "written information" mentioned earlier in subsection (f)). Surely, Indiana argues, the difference must be that "written notice" includes an authorization-of-cancellation form, even if the more general "written information" does not.

We find this argument unpersuasive. Subsection (f) treats "written notice" as a category of "written information": subsection (f)(2) expands on the second category of "written information" discussed in the first sentence of subsection (f)— *i.e.*, "written information" that is "forwarded from the [Indiana] election division from the office in the other state." If authorization-of-cancellation forms are excluded from the definition of "written information," they must be excluded from the definition of "written notice."

Indiana's meaningful-variation argument also runs into trouble with the Act's use of the word "forward." Subsection (f)(2) specifies that when the Election Division receives "written notice" from another state, it will "forward[]" that written notice to county officials. Not summarize, not describe, not pick-and-choose—but *forward*. That is, Indiana election officials must send along *everything* they receive from the other state. The last sentence of subsection (f)(2) states that the voter's signed authorization-of-cancellation form need not be provided to the county "if *the* written notice is *forwarded* by the election division." That makes sense only if "the written notice" and the authorization-of-cancellation are two different things.

There is a more straightforward way to understand the difference between "written notice" and "written information." The key word is again "forward." Outside of subsection (f), the word "forward" is found only in subsection (b)(5), which instructs the Election Division to "forward potential matches" obtained through the IDEA program to county officials. *Id.* § 3-7-38.2-5.5(b)(5). This language is significant because it tells us that "written notice" is just another term for "presumptive IDEA matches." This makes sense, because

IDEA information, like the "written notice" described in subsection (f)(2), is first provided to officials of the Indiana Election Division, and then it is sent to county officials. See *id.* § 3-7-38.2-5.5(c). We do not think it odd that Act 334's drafters chose to distinguish the subset of "written information" that corresponded to the IDEA program with a different term.

Because "written notice" is synonymous with "the IDEA data related to a presumptive match," subsection (f)(2) requires county officials to *presume* that a voter has authorized cancellation of her registration any time they are sent a presumptive match, *even if Indiana has not received an authorization of cancellation from the voter*. Act 334 does not require the IDEA data to include signed authorization-of-cancellation forms. In fact, those forms are notable by their absence from subsections (b) and (c) of the Act, which detail Indiana's procedures for obtaining and using out-of-state voter registration data through the IDEA program. Those sections identify various types of information that Indiana might obtain from other states, including a voter's name, address, driver's license number, social security number, and date of birth. Never, however, do they mention copies of an out-of-state voter registration form that includes the voter's own authorization of cancellation. See *id.* § 3-7-38.2-5.5(b), (c). (Tellingly, neither do the Indiana Election Division's guidelines for implementing the voter-registration statute, even though the Election Division updated them after the passage of Act 334. See Indiana Election Division, *Indiana 2020 Voter Registration Guidebook* (2020), https://www.in.gov/sos/elections/files/2020-Voter-Registration-Guidebook.MOVEDPRIMARY.pdf.)

The Indiana legislature knew how to require states to provide signed authorization forms. It did so explicitly in

subsection (f)(1), which applies when other states provide information directly to county officials. Yet there is no parallel requirement that other states send proof of authorization of cancellation when they send information to the Election Division. This stark contrast in statutory language is no accident. We will not rewrite Act 334 to add a requirement where none exists.

The bottom line is this: any time the Election Division sends county officials a presumptive match based on IDEA data, subsection (f)(2) renders inapplicable the rule that a voter must personally authorize the cancellation of her registration before the county official may take that step. Instead, Act 334 instructs county officials to cancel a voter's registration—without following the NVRA requirements of notice and a waiting period of two election cycles—if those officials determine that (1) a person has registered in two different states and (2) the registration in the second state postdated the Indiana registration. Because this reestablishes the precise scheme we found wanting in *Common Cause I*, we hold that the NVRA preempts subsection (f)(2). This holding makes it unnecessary for us to consider whether the state's litigating position qualifies as an administrative interpretation entitled to judicial deference under Indiana law. See *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1257 (Ind. 2000) (courts are not bound by a state agency's interpretation of a statute where "th[e] interpretation would be inconsistent with the statute itself").

## B

Indiana's second defense of the statute is more limited. The state contends that even if subsection (f)(2) creates a method for Indiana to remove voters without complying with

the NVRA, the Organizations' challenge still fails because they have not shown that subsection (f)(2) has no valid applications. It points out that the Organizations have challenged Act 334 before the state has had an opportunity to apply it. That means, it argues, that they must meet the high threshold for facial invalidity described in *United States v. Salerno*, 481 U.S. 739 (1987). There the Court held that a facial challenge to a statute can succeed only if "no set of circumstances exists under which the [statute] would be valid." *Id.* at 745; see also *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 588–89 (1987) (applying the *Salerno* rule to preemption cases). Here, Indiana asserts that the Organizations cannot make such a showing, because there is at least one hypothetical application of subsection (f)(2) that would not violate the NVRA. It has in mind the possibility that, at the time that the Indiana Election Division forwards "written notice" to the relevant county, Indiana election officials fortuitously happen to possess a voter registration form authorizing cancellation.

The Organizations take a different view. They characterize their suit as a "preenforcement as-applied challenge." Invoking *Gonzales v. Carhart*, 550 U.S. 124 (2007), they argue that a preenforcement challenge may be maintained against a state law so long as the plaintiffs are able to identify a "discrete and well-defined application" of the challenged law that is "likely to occur." *Id.* at 167. This lawsuit concerns a well-defined and likely application of the Act, the Organizations say, because Act 334 does not require or create a mechanism for the Indiana Election Division to obtain copies of registration forms authorizing cancellation and instead only contemplates Indiana obtaining the names, dates of birth, addresses, and social security numbers of individuals through the IDEA program. The state cannot rely on happenstance, rather than legal

structure, to save the law. In essence, the parties disagree over whether a state law can survive a preenforcement preemption challenge if the state can think of a single hypothetical scenario in which the law could be enforced consistently with federal law.

Although the question is fairly debatable, we will accept for present purposes Indiana's argument that we are looking at a facial challenge. The Organizations seek to strike down subsection (f)(2) "in all its applications," and they are reaching "beyond the particular circumstances of the[] plaintiffs" to challenge the application of the law more broadly to all voters who may be removed under subsection (f)(2). See *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010); see also *United States v. Supreme Court of N.M.*, 839 F.3d 888 (10th Cir. 2016).

Nonetheless, even the "no-set-of-circumstances" standard does not mean that facial challenges are impossible. It is always possible to imagine something: extraterrestrials land in Indiana and block county officials from doing their job; someone throws away a piece of paper that reveals an intent to abandon Indiana; or a county official overhears a phone conversation and learns something. Such things are possible, but that is not what the Supreme Court had in mind in *Salerno*, assuming that *Salerno*'s test operates the same way in preemption cases. The Court itself has cast doubt on the latter point. In *Arizona v. United States*, 567 U.S. 387 (2012), a case that was decided a quarter century after *Salerno*, the Court largely upheld a preenforcement preemption challenge to multiple provisions of an Arizona immigration law. Notable for our purposes, the majority opinion in *Arizona* does not cite *Salerno*, and various aspects of its preemption analysis are incompatible with the no-set-of-circumstances test, as a dissenting

Justice noted. See *id.* at 458 (Alito, J., concurring in part and dissenting in part); see also *Lozano v. City of Hazleton*, 724 F.3d 297, 313 n.22 (3d Cir. 2013).

In the end, we need not wade into the debate about the compatibility (or not) of *Arizona* and *Salerno*. In our view, Act 334 would be preempted even under a strict application of *Salerno*. As we noted earlier, Indiana points to one—and only one—hypothetical factual scenario under which (it claims) subsection (f)(2) would not conflict with the NVRA. In its view, so long as the Election Division happens to possess an out-of-state authorization-of-cancellation form any time it forwards presumptive IDEA data to county officials, then the cancellations that occur under subsection (f)(2) comply with the NVRA because they have been undertaken pursuant to a "request of the registrant." See 52 U.S.C. § 20507(a)(3)(A).

But, aside from the problem of relying on secret and accidental information, this hypothetical has a greater flaw. It is incompatible with Act 334 and Indiana's broader voter-registration scheme. For subsection (f)(2) to avoid preemption under Indiana's theory, two conditions would need to be true at all times throughout the administration of the Act: (1) the IDEA program would need to be limited only to the nine states that include an authorization of cancellation with their voter registration forms, and (2) the Election Division would have to obtain authorization-of-cancellation forms for each and every presumptive match it forwards to county officials.

Yet Act 334 makes no provision for either of these conditions to hold true, and indeed, imposing both conditions would severely undermine the operation of the Act. We therefore conclude that Indiana's hypothetical does not describe a

"set of circumstances … under which the Act would be valid." *Salerno*, 481 U.S. at 745.

The first strike against Indiana's position is that Act 334 neither requires nor creates an avenue for the Election Division to obtain copies of out-of-state voter-registration forms as part of the IDEA program. Like Crosscheck before it, the IDEA program contemplates that the several states will share their respective voter-registration *lists* with one another—not the supporting documentation that underlie each state's records. The text of Act 334 confirms this reading. Indiana Code § 3-7-38.2-7.5(1) clarifies that the states that participate in the IDEA program will provide to Indiana their "lists of voters," and that the IDEA program will function by comparing "the lists of voters provided by another state with the list of registered voters in Indiana to identify any individuals who may be registered to vote in more than one state." And Indiana Code § 3-7-38.2-5.5(c) contemplates various categories of information that states might include in the voter lists that they provide to Indiana, such as first, middle, and last name; Social Security number; Indiana driver's license or identification card number; date of birth; and street address. They do not share voter signatures, which might appear on an out-of-state voter-registration form. This practical limitation on the scope of IDEA is not surprising: if participating states had to provide supporting documentation for each registered voter, they might be saddled with significant costs and delays in the administration of the IDEA program.

Indiana's hypothetical also founders because Act 334 does not purport to limit the states that may participate in the IDEA program to only those nine that include an authorization-of-cancellation on their voter-registration forms. A nine-state

limitation on Act 334 would severely undermine the Act's purpose of maintaining accurate voter rolls. Ex-Hoosiers are not only to be found in Delaware, Hawaii, Michigan, New Mexico, North Carolina, South Dakota, Vermont, Virginia, and Wyoming. Nor is it certain that any of these states would agree to participate in IDEA or, if they did, agree also to provide copies not just of their voter lists, but also the underlying documentation.

Indiana's hypothetical cannot carry the weight the state is putting on it. We thus conclude that the Organizations have met their burden of showing that subsection (f)(2) conflicts with, and is thus preempted by, the federal NVRA.

## C

This brings us to the question of relief, which underlies Indiana's final point. The state asserts that the district court's injunction is overbroad and vague. With respect to overbreadth, Indiana asserts that the district court abused its discretion when it enjoined the enforcement of Ind. Code § 3-7-38.2-5.5(d) and (e) in addition to subsection (f), even though the Organizations did not argue, and the district court did not find, that sections (d) and (e) violated the NVRA. With respect to vagueness, Indiana argues that the injunction's prohibition from removing voters from the rolls absent "a request or confirmation in writing *directly* from the voter" (our emphasis) does not give Indiana fair notice of what conduct the injunction prohibits. See FED. R. CIV. P. 65(d)(1)(C); *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 444 (1974). In particular, Indiana contends that the order does not clarify whether receiving a signed out-of-state voter-registration form that authorizes cancellation of a registrant's prior voter registrations (such as the form

described in Ind. Code § 3-7-38.2-5.5(d)(3)) counts as a "direct" communication such that it may be treated as a "request of the registrant" sufficient to cancel a registration under the NVRA. See 52 U.S.C. § 20507(a)(3)(A).

The Organizations counter that Indiana waived these objections by failing to raise them before the district court. See *In re Aimster Copyright Litig.*, 334 F.3d 643, 656 (7th Cir. 2003). The Organizations point out that at an earlier stage they requested an injunction with wording materially similar to the district court's order, yet Indiana opposed the proposed injunction only on the merits and did not raise overbreadth or vagueness objections.

We see no waiver, or even forfeiture, here. Although the Organizations requested an injunction with wording similar to that in the order that eventually issued, the parties were not privy to the full scope of the district court's injunction until the district court released its final order. The state's first chance to raise its objection was thus this appeal. See *Paris v. U.S. Dep't of Hous. & Urban Dev.*, 713 F.2d 1341, 1347 (7th Cir. 1983). *In re Aimster Copyright Litigation* does not support a different result. There, the appellant's Rule 65 challenge was deemed waived because the appellant failed to suggest alternative wording to the district court's order *on appeal*, not just before the district court. See 334 F.3d at 656. Lastly, we have recognized that general waiver principles give way when the lawfulness of injunctive relief is at issue, particularly when a district court has issued an injunction against a state. See *Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791, 797 (7th Cir. 1995); *Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 632 (7th Cir. 2003). Indiana's objections are therefore preserved.

Turning to the substance of Indiana's claims, we agree with the state that the district court's injunction swept too broadly and did not adequately define what exactly should qualify as a direct communication from the voter. Both these points must be addressed on remand.

First, the district court went too far when it enjoined the enforcement not just of Ind. Code § 3-7-38.2-5.5(f), but also Ind. Code § 3-7-38.2-5.5(d) and (e). Subsections (d) and (e) merely restate the NVRA's procedures for removing a registrant from a state's voter list: they provide that a county official may remove a voter from Indiana's voter roll only if the official determines that the registrant authorized cancellation of his or her registration; if not, then the official must send notice to the registrant. See Ind. Code § 3-7-38.2-5.5(d)–(e). Without the mandatory presumption of cancellation in subsection (f)(2), this procedure does not violate the NVRA, nor have the Organizations argued as much. Indeed, subsections (d) and (e) have existed verbatim in prior iterations of Indiana's voter-registration law without controversy. See Ind. Code § 3-7-38.2-5(d), (e) (2016). The same is not true, however, of subsection (f). Given the interrelatedness of the various components of subsection (f), we find that the district court acted within its discretion when it enjoined enforcement of the entire subsection and not just subsection (f)(2).

We are also sympathetic to Indiana's complaint that the word "directly," as used in the district court's injunction, does not clarify whether Indiana may cancel a voter's registration based solely on a voter's personal authorization of cancellation in Indiana that is first given to another state and then forwarded to Indiana by that state. Indiana's confusion may stem in part from our earlier decision in *Common Cause I.*

There we explained that the NVRA prohibits states from can-
celling a voter's registration without "direct contact" with the
voter, and that such direct contact could come in the form of
either (1) a "request of the registrant" that her registration be
cancelled or (2) compliance with the NVRA's notice-and-
waiting procedures. See *Common Cause I*, 937 F.3d at 958–59.
We further stated that the "only straightforward reading of
the phrase 'at the request *of the registrant*' is that the registrant
herself makes the request to the state." *Id.* at 961. What we left
undecided, however, was whether a state was entitled to can-
cel a voter's registration based "a copy of a communication
from a suspected Indiana registrant" authorizing cancellation
that "passed through multiple hands." *Id.* In short, may a
voter rely on another state to serve as her agent in passing
along her personal authorization to cancel?

Indiana takes the position that an authorization-of-
cancellation form qualifies as a "request of the registrant"
under the NVRA, and so the district court's injunction should
not bar the state from cancelling a voter's registration
automatically upon receipt of such a form. The state wants to
know, however, if it must receive authorization-of-
cancellation forms *directly* from voters, or if it is enough for
the voter to submit the form to the new state and trust it to
convey the form back to Indiana.

We see nothing in the NVRA that would prohibit the
second method of passing along the voter's choice to Indiana.
An authorization-of-cancellation form that a voter personally
signs and that is then forwarded to Indiana from another state
complies with section 20507(a)(3)(A) of the NVRA. When we
stated in *Common Cause I* that the NVRA requires "direct"
contact with a voter, we meant that a communication must be

*generated by the voter* to qualify as a "request of the registrant"—not by a third party. This point should be reflected in the district court's revised injunction.

## IV

We AFFIRM the district court's grant of summary judgment and we AFFIRM IN PART and VACATE IN PART the district court's permanent injunction. The case is REMANDED for further proceedings consistent with this opinion.